**ANTILLES CEMENT CORPORATION,**
Plaintiff

v.

**Sila M. CALDERON, et al., Defendants**

**No. CIV. 02–1643(JP).**

United States District Court,
D. Puerto Rico.

Oct. 16, 2003.

Surface Transportation Assistance Act of 1982, 23 U.S.C. §§ 101–161, as implemented by federal regulations 23 C.F.R. 635.409 and 635.410, which Plaintiff claims prohibit states using federal funds for highway construction from imposing requirements that discriminate against materials from other states.

## II. FACTS

On July 12, 1985, the Puerto Rico Legislature enacted "Law 109", which requires that construction projects funded by the Government of Puerto Rico or the United States use only cement manufactured in Puerto Rico. The law applies to the government itself and to entities that contract with the government to complete government-funded projects. The types of cement covered by the law are premixed concrete, cement blocks, concrete mixed at the work site, and the mixture used for plastering. The law provides exceptions that permit covered entities to use imported cement where there is a breakdown or equipment failure in Puerto Rico cement plants, where Puerto Rican cement is not available in sufficient quantities or is not of a satisfactory quality, and where the use of Puerto Rican cement would exceed the maximum percent of funding allowed by the government for cement in a given state-funded project. *See* Law 109, 3 P.R. Stat. Ann. §§ 927–927h.

According to the "Guide for Interpretation and Application of the Laws," approved by the Association of Preference for Government Purchases in April, 2002, the law was passed in reaction to a crisis confronting the Puerto Rican construction industry. The law was designed to create jobs and to help local businesses by substituting imports with Puerto Rican products.

On September 17, 2001, the Puerto Rico Legislature enacted Law 132, which states

Lino J. Saldaña, Saldaña, Saldaña–Egozcue & Vallecillo, PSC, Santurce, PR, for Plaintiff.

Salvador J. Antonetti–Stutts, Pietrantoni Méndez & Alvarez, Gerardo De Jesús Annoni, Sánchez Betances & Sifre, P.S.C., Mariana Negrón Vargas, Commonwealth Department of Justice, Federal Litigation Division, San Juan, PR, for Defendant.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it Plaintiff's "Motion for Summary Judgment" (docket No. 7), Defendants' opposition thereto (docket No. 15), Defendants' "Motion to Dismiss" (docket No. 14), and Plaintiff's opposition thereto (docket No. 21).

Plaintiff brings the instant action seeking declaratory judgment stating that Puerto Rico Laws 109, 3 P.R. Stat. Ann. §§ 927–927h and 132, 10 P.R. Stat. Ann. § 167e(a),(b), which prohibit the use of non-Puerto Rican cement in construction projects funded by the Commonwealth of Puerto Rico or the United States, violate the Dormant Foreign Commerce Clause of the United States Constitution. In addition, Plaintiff seeks a declaratory judgment stating that the laws violate the Supremacy Clause of the U.S. Constitution, as they allege that they conflict with the

that bags of cement manufactured outside Puerto Rico must contain a written warning stating the cement contained in the bag may not be used for construction work for the government of the United States and of Puerto Rico. *See* Law 132, Articles 9(a) and 9(b).

Plaintiff Antilles Cement Corporation imports cement manufactured in foreign countries to Puerto Rico then sells the cement to various enterprises in Puerto Rico, including manufacturers of pre-mixed concrete. Plaintiff has imported cement manufactured in Denmark, China, and Columbia for sale and distribution in Puerto Rico.

Plaintiff now moves for summary judgment, alleging that Law 109 and Law 132 violate the Dormant Foreign Commerce Clause of the U.S. Constitution by discriminating against cement manufactured outside Puerto Rico. Plaintiff states that, as an importer of foreign cement, it has suffered economic injury as a result of both Law 109 and Law 132. Plaintiff also alleges that Law 109 directly conflicts with the regulations interpreting the Surface Transportation Assistance Act ("STAA") of 1982, 23 U.S.C. §§ 101–161, which prohibit states using federal funds for highway construction from imposing requirements that discriminate against materials from other states. According to Plaintiff, Law 109 violates the Supremacy Clause of the U.S. Constitution, in that it conflicts with these federal regulations.[1]

Defendants raise the following arguments in response to Plaintiff's allegations. First, Defendants assert that Plaintiff lacks standing to contest any aspect of Laws 109 and 132 that may violate the domestic Commerce Clause because Plaintiff is an importer of foreign cement. Therefore, Plaintiff did not sustain any injury related to the domestic commerce restrictions imposed by the law and accordingly lacks standing to contest them. According to Defendant, Plaintiff's lack of standing also prevents it from arguing that laws 109 and 132 conflict with the STAA in violation of the Supremacy Clause. In addition, Defendants state that Laws 109 and 132 do not violate the Commerce Clause because Congress has "sanctioned" laws of this type by not passing legislation invalidating existing "Buy American" legislation passed in various states. According to Defendants, Congress is aware of state efforts to restrict procurement of foreign goods in state-funded construction projects and has yet to impose a policy of national uniformity. They allege that this inaction constitutes Congressional approval. Finally, Defendants argue that, even without this tacit approval, Laws 109 and 132 are not unconstitutional under the Commerce Clause.

Defendants argue that summary judgment is not appropriate at this stage in the proceedings because the parties have yet to begin the discovery process. However, the Court finds that there are no material facts in dispute in the instant case. The

---

**1.** Plaintiff had, in its original complaint, alleged that Laws 109 and 132 conflicted with the federal Buy American Act, 41 U.S.C. § 10b. The "Buy American Act" requires that all federally-funded construction projects in the United States and its territories, including Puerto Rico, use materials produced in the United States. However, Plaintiff amended its complaint to withdraw this cause of action, stating that the provisions of the Buy American Act did not apply to construction contracts made by agencies of the Commonwealth of Puerto Rico. Plaintiff is correct in stating that the Buy American Act applies only to contracts with federal agencies, not to contracts involving state agencies or agencies of the Commonwealth of Puerto Rico. *See* 41 U.S.C. § 10b. The United States is not a Defendant in this suit; the Government of Puerto Rico is the Defendant. Thus, a claim related to the Federal Buy American Act is not properly before the Court at this time.

content of the law at issue is clear, as is the status of Plaintiff as an importer of foreign cement. Accordingly, the Court **DENIES** Defendant's request to deny Plaintiff's motion for summary judgment without prejudice (docket No. 15) and will proceed with the analysis of Plaintiff's motion for summary judgment.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *Id.* at 248; *Mack v. Great Atl. & Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *See First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See id.; see also Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## IV. CONCLUSIONS OF LAW

### A. Does Plaintiff have Standing to Challenge the Aspects of Law 109, Law 132, and the Surface Transportation Assistance Act that impact solely Domestic Commerce?

Article III of the Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies". The doctrine of standing has developed to identify those disputes which are appropriately resolved through the judicial process. *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990).

In order to have standing to challenge a law, a Plaintiff must establish the following three factors. First, the Plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual and imminent, as opposed to conjectural or hypothetical. Second, there must be a causal connection between the injury

and the conduct complained of. Finally, it must be "likely," as opposed to merely "speculative," that the injury claimed will be redressed by a favorable decision. *See Luján v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

The party invoking federal jurisdiction bears the burden of establishing these elements. *See id.*, 504 U.S. at 561, 112 S.Ct. at 2136. These elements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *See id.* In response to a motion for summary judgment, the Plaintiff must set forth, by affidavit or other evidence, specific facts which for purposes of the summary judgment motion will be taken to be true. *See id.*

■ Supreme Court precedent establishes that, in order to show an "injury in fact," the first essential element for standing, the petitioner must allege a concrete, particularized, and actual or imminent injury. For example, in *Sierra Club v. Morton*, Plaintiff, a not-for-profit corporation, challenged plans to develop a national park into a ski resort. 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Plaintiffs stated that the development would destroy scenery to the detriment of future generations. *See id.* The Court held that the Plaintiff had not adequately alleged an injury in fact because it did not provide evidence that any of its members had been or would be injured by the development. *See id.*

■ Plaintiff has alleged that it has suffered economic injury as a result of the laws at issue. The laws prohibit the use of Plaintiff's product in construction projects in Puerto Rico because Plaintiff's product is manufactured abroad. Palpable economic injury has long been recognized as a basis for standing. *See Sierra Club*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Thus, Plaintiff certainly has standing to contest the portion of the law that injures it, which is the portion of the law that impacts foreign commerce. However, Plaintiff cannot show that it suffered an "injury in fact" based on the laws' prohibitions affecting *domestic* commerce. It is true that the exclusion of products from other parts of the United States certainly causes economic injury, which is a cognizable injury for purposes of standing. However, "the injury in fact test requires more than an injury to be a cognizable interest. It requires that the party seeking review be himself among the injured." *See Sierra Club*, 405 U.S. at 735, 92 S.Ct. at 1366. The Plaintiff is not among those injured by the restrictions that Laws 109 and 132 place on domestic commerce. Under these laws, it would be illegal for a government contractor using funds from the Puerto Rico government to use cement from another state, for example, Massachusetts or Florida, in the publicly-funded project. Plaintiff only imports foreign cement to Puerto Rico; it is not injured by any restrictions the laws place on United States cement that is manufactured outside Puerto Rico.

In its motion to dismiss, Defendants challenged Plaintiff's standing. Plaintiff did not provide any facts that would show any injury in fact due to the Laws' effects on domestic commerce. Plaintiff itself appears to only challenge the aspect of Laws 109 and 132 that impact foreign commerce. In its complaint, Plaintiff states that "Plaintiff Antilles Cement Corporation, as an importer of foreign cement that sells and distributes such product in Puerto Rico, suffers economic injury from the discrimination under Law 109 against *foreign* cement manufacturers" (emphasis added) and, for Law 132, "Plaintiff Antilles Ce-

ment Corporation, as an importer of foreign cement that sells and distributes such cement in Puerto Rico in bags as well as in bulk suffers economic injury from the discrimination under Law 132 against *foreign cement*" (emphasis added).

The Court finds that Plaintiff has not shown that it has standing to contest the portions of Laws 109 and 132 that impact domestic commerce. Plaintiff has not shown that it has suffered or will suffer any "injury in fact" based on these portions of the laws. Plaintiff has standing, as an importer of foreign cement, to contest only the portions of the laws that impact foreign commerce. Therefore, the Court will not address the constitutionality of those aspects of Laws 109 and 132 that effect domestic commerce in the instant opinion.

■ In its motion for summary judgment, Plaintiff claims that Laws 109 and 132 violate the Supremacy Clause of the U.S. Constitution because they conflict with regulations 23 C.F.R. 635.409 and 635.410, which interpret section 165 of the Surface Transportation Assistance Act (STAA) of 1982, 23 U.S.C. §§ 101–164. According to Plaintiff, these regulations state that, with respect to federally-funded highway projects, Puerto Rico cannot impose requirements favoring cement produced within Puerto Rico. Thus, Laws 109 and 132 conflict with federal law and are invalid under the Supremacy Clause. The relevant portion of these federal regulations states that, when a state participates in federally-funded highway projects,

> No requirement shall be imposed and no procedure shall be enforced by any State transportation department in connection with a project which may operate:
> (a) To require the use of or provide a price differential in favor of articles or materials produced within the States, or

otherwise to prohibit, restrict, or discriminate against the use of articles or materials shipped from or prepared, made or produced in any State, territory or possession of the United States. 23 C.F.R. § 635.409.

These regulations do not have any bearing on foreign commerce; if Laws 109 and 132 conflict with these regulations, they only do so based on their impact on *domestic* commerce. Defendants argue that Plaintiff, who solely imports foreign cement, does not have standing to bring a Supremacy Clause challenge against Laws 109 and 132. The Court agrees. As discussed above, Plaintiff must show that it suffered an injury in fact in order to contest the constitutionality of a law. Laws 109 and 132 may conflict with federal regulations dealing with domestic commerce; however, Plaintiff cannot contest this aspect of the laws. Plaintiff has not alleged or shown that it suffered any injury based on the domestic commerce prohibitions contained in laws 109 and 132. Thus, the Court finds that Plaintiff lacks standing to challenge the constitutionality of the laws on domestic commerce grounds, including the specific challenge that the Laws conflict with federal regulations under the STAA that prohibit discrimination against construction materials from other states in federally-funded highway construction projects.

### B. Is Law 109 Constitutional Under the Dormant Foreign Commerce Clause?

### 1. Introduction and Applicable Law: Domestic Commerce

■ The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce with foreign nations, and among the several states." U.S. Const. art. I, § 8, cl.3.

Courts have long held that the Commerce Clause applies to Puerto Rico. *See Secretary of Agriculture v. Central Roig Refining Co.,* 338 U.S. 604, 616, 70 S.Ct. 403, 409, 94 L.Ed. 381 (1950). While the language of the Commerce Clause only speaks of the power of Congress to regulate commerce, the Commerce Clause has been interpreted to contain an implicit restraint on state power even in the absence of Congressional action, a notion which has come to be known as the "dormant Commerce Clause." *See Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 870, 112 L.Ed.2d 969 (1991). Thus, the Commerce Clause has been interpreted to limit the ability of the states to interfere with domestic and foreign commerce.

■ A special exception to the Commerce Clause, known as the "market participant" exception, has developed in cases where state actors participate in the market. *See White v. Massachusetts Council of Construction Employers,* 460 U.S. 204, 206, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983). This exception has developed in the context of domestic commerce, and its controversial application to foreign commerce will be discussed in a later section. In designing this exception, the Supreme Court drew a distinction between state actors who "regulate", for example, impose taxes and regulations that effect private commercial activity, and state actors who "participate" in the market as buyers or sellers, spending their own funds in the marketplace. *See id.* A state that acts as a "market participant" is not subject to the restrictions of the Commerce Clause, just as a private actor who buys and sells in the private market is not subject to the limitations of the clause. *See id.* at 208, 103 S.Ct. 1042. The rationale behind the exception is based in "the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *See Reeves, Inc., v. Stake,* 447 U.S. 429, 438–49, 100 S.Ct. 2271, 2278–79, 65 L.Ed.2d 244 (1980) (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). The Commerce Clause developed in response primarily to state taxation and regulatory efforts that impeded free private trade in the marketplace. *See id.,* 447 U.S. at 437, 100 S.Ct. at 2277. The drafters of the Constitution did not intend for the Commerce Clause to limit the ability of the states to participate freely in the market. *See id.,* citing L. Tribe, *American Constitutional Law,* 336 (1978).

*White v. Massachusetts* is an excellent example of the type of factual situation that gives rise to the market participant exception and is quite similar to the factual situation in the instant case. 460 U.S. 204, 206, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983). In *White,* the city of Boston enacted a law requiring city-funded construction contractors to hire at least 50 percent of their crews from a pool comprised of Boston residents. *See id.* The Court upheld the law, holding that the city was acting as a market participant. *See id.*

Based on the guidelines established by Supreme Court precedent, the Government of Puerto Rico is acting as a "market participant" in the instant case. The government enters the construction market and funds construction projects with its own funds, just as the City of Boston expended its funds for construction projects. If the issue at hand was the restrictions Laws 109 and 132 place on *domestic* commerce, the instant inquiry would be over and the Court would hold that the Puerto Rican Government is exempt from the coverage of the Commerce Clause because it is acting as a market participant. However, as discussed in the previous section on standing, the issue of the Laws'

effect on domestic commerce is not before the Court today. The Court is only deciding whether the Laws at issue are unconstitutional based on their impact on *foreign* commerce, as the Plaintiff lacks standing to challenge their domestic impact.

## 2. Scrutiny Applied to Laws Affecting Foreign Commerce

Discrimination against foreign commerce is subject to an even more rigorous test than that applied to domestic commerce. *See South–Central Timber Dev. Inc. v. Wunnicke,* 467 U.S. 82, 100, 104 S.Ct. 2237, 2247, 81 L.Ed.2d 71 (1984); *Japan Line Ltd. v. County of Los Angeles,* 441 U.S. 434, 449, 99 S.Ct. 1813, 1822, 60 L.Ed.2d 336 (1979); *National Foreign Trade Council v. Natsios,* 181 F.3d 38, 68–69 (1st Cir.1999), aff'd on other grounds, *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). If a Court upholds state action affecting foreign commerce, "it must be shown not to affect national concerns to any significant degree, a far more difficult task than in the case of interstate commerce." Laurence G. Tribe, American Constitutional Law, at 1152 (3d. Ed.2000). For example, the government contract situation in *White,* where the facts involved the hiring of Boston residents for city-funded construction projects, has little effect on issues of international concern; in the *instant matter,* however, the restriction on the use of foreign cement reaches beyond the boundaries of Puerto Rico and edges into questions of foreign economic policy, an area that implicates not just Puerto Rico but the United States as a whole. Based on precedent, the laws should be invalidated if they are shown to have serious adverse effects on national concerns, as the Court will discuss below.

The Supreme Court has not fully explained the content or the extent of this increased scrutiny; however, it has provided some guidance as to the rationale behind it. For example, in *Japan Line,* the Court found that a California ad valorem tax placed on cargo containers owned by certain Japanese shipping companies was invalid under the Commerce Clause. 441 U.S. at 448, 99 S.Ct. at 1813. The Court stated that "there is evidence that the Founders intended the scope of the foreign commerce power to be greater" than that of "the domestic commerce power." *See id.* The central rationale behind the Court's holding was the effect that the particular tax scheme would have on the ability of the nation to speak "with one voice" in matters of foreign affairs. *See id.* The Court pointed to the fact that states laws burdening foreign commerce could "impair federal uniformity in an area where federal uniformity is essential." 441 U.S. at 448, 99 S.Ct. at 1821. According to the Court, foreign commerce is fundamentally a matter of national concern. The Court stated,

A state tax on instrumentalities of foreign commerce may frustrate the achievement of federal uniformity in several ways. If the state imposes an apportioned tax, international disputes over reconciling apportionment formulae may arise. A novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged y the levy may retaliate against American-owned instrumentalities present in their jurisdictions. Such retaliation of necessity would be directed at American transportation equipment in general, not just that of the taxing State, so that the Nation as a whole would suffer. If other States followed the taxing state's example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from 'speaking with one voice' in regu-

lating foreign commerce. *Japan Line,* 441 U.S. at 450, 99 S.Ct. at 1823.

In *Japan Line,* the Court did not articulate a general rule making laws that burden foreign commerce per se invalid; instead, the Court evaluated the particular effects of the situation at issue on foreign commerce. Now that the Court has articulated the general standard for evaluating laws effecting foreign commerce, it will determine whether the market participant exception can be extended to such laws.

### 3. Does the Market Participant Exception Extend to the Foreign Commerce Context?

■ As discussed in the previous section, if a Court determines that a state actor is a market participant, the state actor is beyond the reach of the restrictions imposed by the commerce clause. However, given the heightened scrutiny applied to laws effecting foreign commerce, can the market participant exception also be extended to the foreign commerce context? The Supreme Court has yet to resolve this issue. In *Reeves,* the Court commented that "[w]e have no occasion to explore the limits imposed on state proprietary actions by the foreign Commerce Clause," but added that "such scrutiny may well be more rigorous when a restraint on foreign commerce is alleged," 447 U.S. at 437, n. 9, 100 S.Ct. at 2271, reflecting the heightened scrutiny noted above in the discussion of *Japan Line.*

The Third Circuit has elected to extend the market participant exception to the foreign commerce context. *See Trojan Technologies v. Commonwealth of Pennsylvania,* 916 F.2d 903 (3rd Cir.1990). In *Trojan,* a Canadian company challenged the "Pennsylvania Steel Products Procurement Act," which required state contractors to use steel produced in the United States in public construction projects, a

factual situation quite similar to the instant case. *See id.* at 904–905. While the Court recognized that "the Supreme Court has suggested that statutes affecting foreign commerce are subject to a more searching review," it upheld the Pennsylvania statute, isolating two key factors underlying the application of this heightened scrutiny. *See id.* at 912. First, the Court noted the dangers of multiple taxation as discussed above in *Japan Line,* 441 U.S. at 446, 99 S.Ct. at 1820. Second, the Court pointed to the concern expressed in *Japan Line* that state laws burdening foreign commerce could "impair federal uniformity in an area where federal uniformity is essential." *See id.,* citing *Japan Line,* 441 U.S. at 448, 99 S.Ct. at 1821. Applying these factors, the Court found that state procurement practices, such as the Pennsylvania law at issue, "present no problems of reconciling conflicting policy among multiple national sovereigns," without elaborating the basis for this conclusion, and concluded that the Pennsylvania law survived the Commerce Clause challenge. While the Court in *Japan Line* did not decide whether, as a rule, the market participant exception extends to foreign commerce, choosing instead to concentrate on whether the exception was warranted based on the particular facts of the case, the Court in *Trojan* did definitively decide that the extension of the market participant exception to state procurement practices involving foreign goods is constitutional under the commerce clause.

The First Circuit has chosen not to extend the market participant exception to the foreign commerce context; however, it reached this conclusion based on a factual scenario quite distinct from that of the instant case. *See Foreign Trade Council v. Natsios,* 181 F.3d 38 (1st Cir.1999). In *Natsios,* a group of companies challenged a Massachusetts law that restricted the

ability of Massachusetts and its agencies to purchase goods or services from companies doing business with the nation of Burma. The Court struck down the law on the grounds that it encroached on the exclusive power of the federal government to manage foreign affairs, that Massachusetts was not acting as a market participant, that the law violated the Foreign Commerce Clause, and that federal law imposing sanctions on Burma preempted the Massachusetts Burma Law. The Supreme Court upheld the decision, but on the grounds that the law violated the Supremacy Clause. *See Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

The First Circuit decided not to extend the market participant exception in *Natsios,* stating:

> We are skeptical of whether the market participant exception applies at all (or without a much higher level of scrutiny) to the Foreign Commerce Clause. Contrary to the Third Circuit's view in *Trojan Technologies* we believe that the risks inherent in state regulation of foreign commerce—including the risk of retaliation against the nation as a whole and the weakening of the federal government's ability to speak with one voice in foreign affairs. *see Japan Line* weigh against extending the market participant exception to the foreign commerce clause. *Natsios,* 181 F.3d at 66 [citations omitted].

Defendants claim that the Court's holding in *Natsios* has no bearing on the instant case, arguing that the holding reacts to a very different set of facts than those in the instant case. In *Natsios,* the law at issue targeted a specific foreign country and obviously implicated highly-charged foreign policy issues, in contrast with the instant case. Thus, according to the Defendants, the reasons underlying the Court's decision to not extend the foreign Commerce Clause are based on the specific facts of *Natsios.*

While the First Circuit did not make a definitive statement as to whether the market participant exception extends to the foreign commerce context, it certainly expressed strong doubts. The First Circuit stated, "we are skeptical of whether the market participant exception applies at all (or without a much higher level of scrutiny) to the Foreign Commerce Clause" and that the inherent risks in the state regulation of foreign commerce "weigh against" extending the exception to foreign commerce context. *See id.* While *Natsios* does not necessarily prohibit this Court from finding that the market participant exception applies in the instant case, the Court finds that the plain language of *Natsios* strongly advises against this result. Thus, based on precedent's recognition of the inherent risks of extending this exception into the foreign commerce context alone, the Court chooses not to apply the market participant exception in the instant case. In addition, the Court agrees with the reasoning behind *Natsios* and *Japan Line* and finds that Laws 109 and 132 pose dangers to the ability of the nation to speak with one voice, which the Court will explain further in the following section. Accordingly, the Court finds that the risks to foreign commerce are too great to allow the extension of the market participant exception in the instant case. Thus, the Court holds that Defendants are not shielded from constitutional scrutiny under the Market Participant exception to the Commerce Clause and will proceed to determine whether Law 109 violates the Foreign Dormant Commerce Clause.

**4. Does Law 109 Violate the Foreign Dormant Commerce Clause?**

■ The Court will now evaluate whether the laws at issue are unconstitutional

under the Foreign Commerce Clause. The laws at issue facially discriminate against foreign-produced cement. According to the Supreme Court, "Absent a compelling justification ..." a State may not advance its legitimate goals by means that facially discriminate against foreign commerce. *See Kraft General Foods, Inc. v. Iowa Dept. of Revenue and Finance*, 505 U.S. 71, 81, 112 S.Ct. 2365, 2371, 120 L.Ed.2d 59 (1992). According to the First Circuit, "a statute that facially discriminates against interstate or foreign commerce will, in most cases, be found unconstitutional." *See Natsios*, 181 F.3d at 67. Precedent has already established that regulations affecting foreign commerce require a very high level of scrutiny due to the risk that they could "impair federal uniformity in an area where federal uniformity is essential." *Trojan*, 916 F.2d at 912, citing *Japan Line*, 441 U.S. at 448, 99 S.Ct. at 1821; *Natsios*, 181 F.3d. at 66 (pointing to the dangers posed by state action affecting foreign commerce to the nation's "ability to speak with one voice"). The history of the Commerce Clause illustrates this point:

> The Commerce Clause reformed a nation of discriminatory, self-protective, and retaliatory states engaged in destructive trade wars with one another. The drafters of the Clause decided that the source of the problems of the Articles of Confederation stemmed from state governments which had been too responsive to local economic interests in the absence of a central government capable of economically unifying the several states. The drafters of the Constitution decided that the remedy was to shift legislature authority of such matters to Congress, a national body in which competing economic factions would neutralize one another and thereby free commerce from stifling regulation ... The Constitution was framed

> ... upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division. Kenton O'Neil, *'Buy American' Statutes: Should the Market Participant Doctrine Shield Pennsylvania's Steel Products Procurement Act from Commerce Clause Scrutiny?*, 96 Dick. L.Rev. 519, 529 (1992).

While not binding precedent on the Court, the Court finds the California Court of Appeals analysis of the California "Buy American" Act instructive for determining the possible risks to uniform foreign policy posed by Laws 109 and 132. The California Court of Appeals held unconstitutional the California "Buy American" Act, a statute similar to the one at issue that awarded state contracts only to persons who would agree to use materials manufactured in the United States. *See Bethlehem Steel Corp. v. Board of Comm'rs of the Dept. of Water and Power of the City of Los Angeles*, 276 Cal.App.2d 221, 80 Cal.Rptr. 800 (1969). The Court found that the Act, "in effectively placing an embargo on foreign products, amounts to a usurpation by this state of the power of the federal government to conduct foreign trade policy." *See id.* at 225, 80 Cal.Rptr. 800. According to the Court, "Only the federal government can fix the rules of fair competition when such competition is on an international basis. Foreign trade is properly a subject of national concern, not state regulation. State regulation can only impede, not foster, national trade policies. The problems of trade expansion or non-expansion are national in scope, and properly should be national in scope in their resolution." *Id.* at 226, 80 Cal.Rptr. 800. The Court stated that other countries may view the Act as a product of "selfish provincialism" and that it is the "type of protectionism which in-

vites retaliative restrictions on our own trade." *Id.* at 228, 80 Cal.Rptr. 800.

■ Before determining whether the instant laws violate the commerce clause, the Court must first evaluate the legitimate interests cited by the Puerto Rican government to support the laws and decide whether they are sufficiently compelling to withstand intense Constitutional scrutiny. Defendants state that Law 109 was enacted to create jobs for Puerto Rican workers, to build local capital, and to improve the Puerto Rican economy in general through the replacement of foreign building materials with locally-produced materials. However, precedent establishes a very high bar for laws that have economic protectionism as their main goal and clearly discriminate against foreign producers; they are virtually per se invalid. *See e.g. Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). The interests of the United States in federal uniformity in the area of foreign trade far outweigh the interests of Puerto Rico in this matter.

Puerto Rico and the United States are one indivisible nation. Through Laws 109 and 132, Puerto Rico is concentrating on its own local economic interests without regard to the broader economic interests of the United States, and separating itself from approved, favorable economic policy. Foreign cement is intimately intertwined with foreign relations. Puerto Rico's regulations regarding cement could lead to retaliatory trade actions by the foreign communities affected by Law 109. This retaliation would injure not only Puerto Rico but the entire nation. It is clear that Law 109 has a substantial affect on foreign commerce and that it would significantly interfere with the nation's ability to "speak with one voice" as to matters involving international trade.

This Court's decision, however, is not based on Puerto Rico's relationship, political or otherwise, with the United States. Puerto Rico is the United States. The Court's opinion is based on the Commerce Clause of the United States Constitution, which applies equally to all states, including Puerto Rico. Therefore, the Court's opinion would be the same if the facts in this case involved any other state or territory. Simply put, a state or territory of the United States is not permitted to make restrictions on foreign commerce unless the restrictions are approved by Congress. That is not the case here.

Therefore, the Court finds that Law 109 discriminates against imports from foreign nations in violation of the Foreign Commerce Clause to the United States Constitution. This discrimination could lead to retaliation that would injure the nation as a whole.

5. **Has Congress Implicitly Sanctioned the segments of Laws 109 and 132 impacting Foreign Commerce, Making them Exempt from a Constitutional Challenge under the Commerce Clause?**

■ It is well-established that state laws that might otherwise be barred by the dormant Commerce Clause are permissible if sanctioned by Congress. *See Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 434, 66 S.Ct. 1142, 1157, 90 L.Ed. 1342 (1946). The analysis created under the Dormant Commerce Clause, whether domestic or foreign, applies only to cases where the Federal Government has not affirmatively acted. *See Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1, 5, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986). Thus, where Congress has not acted, it falls to the Judiciary to decide whether a law is in violation of the Commerce Clause. In this case, the Court has applied the

Dormant Foreign Commerce Clause because Congress has not made a definitive statement as to the propriety of "Buy American" laws in the states or territories. Had the federal government spoken regarding this issue, the Court would not apply the Dormant Commerce Clause analysis, even where the Court finds, as it has here, that the law is in violation of the commerce clause. *See id.,* 477 U.S. at 8, 106 S.Ct. at 2373.

For example, in *Wardair,* the Court found that a state tax on aviation fuel did not violate the Dormant Foreign Commerce Clause because numerous international agreements demonstrated that the federal government had affirmatively acted, rather than remained silent, regarding the power of the states to tax aviation fuel.

■ Defendants argue that Law 109 has been sanctioned by Congress because Congress has effectively granted approval to state "Buy American" statutes, laws which prohibit the purchase of goods produced outside of the United States for use in publicly-funded construction projects. *See* O'Neil, 96 Dick. L.Rev. at 529.

A number of states have passed laws requiring that construction materials used in state-funded construction projects must be produced in the United States.[2] These

laws are very similar, if not virtually identical, to Law 109, except for the fact that the state laws do not specify that the construction materials must be from a particular state, whereas Law 109 requires that the materials be specifically from Puerto Rico.[3]

The Defendants argue that Congress has effectively sanctioned "Buy American" statutes because, while it is aware of such statutes, Congress has not taken any affirmative action to invalidate, alter, or prohibit the statutes. Defendants cite to *Trojan,* where the Court stated that "The ['Buy American' statutes] seem to us to come exceedingly close to providing such approval. If such were the case, there would be no dormant Commerce Clause issue to be decided as the state legislation would have received Congressional imprimatur—*Cf. Wardair*—However, since these agreements and statutes do not contain a clear statement of acquiescence in state 'Buy American' statutes, we will go on to consider the commerce clause challenge." 916 F.2d at 909 [citations omitted]. Defendants argue that this statement shows that 'Buy American' statutes have gained Congressional approval, while Plaintiff argues that the statement shows that a "clear statement of acquiescence" is

---

**2.** At least 12 states have some form of "Buy American" legislation. *See* Ala.Code § 29–3–4 *et seq.* (1987 Supp.), Ill.Rev.Stat. ch. 48, para 1801, *et seq.* (1986), Ind.Code Ann. § 5–16–8–2 *et seq.* (West 1984), Mass. Gen. Laws Ann. ch. 7 § 22 (1969), Md. State Fin. Proc.Code Ann. § 12–401 *et seq.* (1985), N.Y. State Fin. Law § 146 (1988), W. Va.Code § 5–19–1 *et seq.* (1987), R.I. Gen. Laws § 37–2.1 *et seq.* (1984), Ohio Rev.Code Ann. § 153.011 (1987), N.J. Stat. Ann. § 40A:11–18 (West 1973).

A federal "Buy American Act" also exists. The federal law states that all federally-funded projects must use only construction materials that are produced in the United States. However, the issue in this case involves a law created at the state or territorial level, so the

federal "Buy American" act will not be considered a statement as to the propriety of state or territorial efforts to limit the use of foreign construction materials in state-funded projects. *See* 41 U.S.C. § 10b.

**3.** For example, the Ohio Revised Code Annotated states, "whenever any building or structure, including highway improvements, in whole or in part supported by state capital funds ... is to be erected or constructed ... if any steel products are to be purchased for or provided in the construction, repair, or improvement project, only steel products [produced in the United States] shall be purchased for or provided in the project." Ohio Rev.Code Ann. § 153.011 (1987).

required under the Commerce Clause. The Court finds that the statement as to this issue in *Trojan* is ambiguous at best and does not provide convincing support for the argument that state "Buy American" statutes have been silently approved by Congress.

Defendants cite a federal regulation and its interpreting language to show that Congress is aware of state "Buy American" laws and has sanctioned them. Defendants point to 23 C.F.R. § 635.410(b)(2), a regulation applying the Federal Buy American Act to federally-funded highway construction projects, which states that a Federal highway project may not proceed unless "[t]he state has standard contract provisions that require the use of domestic materials and products, including steel and iron materials, to the same or greater extent as the provisions set forth in this section."

Next, the Defendants cite that Federal Highway Administration's interpretation of this section, noting that "[s]tates are permitted by [said legal provisions] to have 'Buy America' provisions that are more restrictive than the federal requirements ... While we have no specific detail on which States have more restrictive requirements, we are aware that some states have implemented provisions of 'Buy America' for cement." *See* FHWA Contract Administration Core Curriculum Participants Manual and Reference Guide, Ch. II–B, § B–1.

This regulation and its accompanying interpretation do not constitute approval of "Buy American" statutes. In *Wardair,* the Court held that a state tax was constitutional under the Commerce Clause where the federal government had enacted over 70 international treaties affirming the policy promoted by the state's tax. That is not the case in the instant matter. While Congress has given express approval for restrictions on the use of foreign materials in federally-funded construction projects through the "Buy American" Act, it has not granted similar approval for laws prohibiting the use of foreign materials in state-funded construction projects. The only evidence Defendants present to the contrary is an isolated statement by the Federal Highway Administration that merely notes that some states have passed Buy American laws without further discussion. According to *Trojan,* something resembling a clear statement is necessary to gain Congressional approval; mere Congressional inaction is not sufficient. The very purpose of the dormant commerce clause analysis is to allow the Court to find that a law violates the Commerce Clause even though Congress has not spoken. Thus, the Court holds that Laws 109 and 132 have not been approved by Congress to the extent necessary to make them constitutional under the Commerce Clause.

Because Laws 109 and 132 are not exempt from review under the market participant exception, have not been sanctioned by Congress, and are unconstitutional under the Dormant Foreign Commerce Clause of the United States Constitution, the Court **HOLDS** that the Government of Puerto Rico must **AMEND** Laws 109 and 132 so that they comply with the U.S. Constitution. As mentioned before, the Court has not determined whether the wording contained in Laws 109 and 132 that effects domestic commerce is constitutional under the domestic Commerce Clause because Plaintiff lacks standing to challenge this aspect of the laws, as it is only injured by the Laws' impact on foreign commerce. In its current state, Law 109 prohibits the use of cement from anywhere besides Puerto Rico in projects funded by the Government of Puerto Rico. The law does not specifically distinguish between foreign and domestic cement.

However, as the law does functionally prohibit the use of foreign cement, it must be amended to remove this prohibition.

### 6. Is Law 132 Unconstitutional Under the Foreign Commerce Clause?

Up to this point, the Court has discussed primarily the constitutionality of Law 109. However, the Plaintiff has also alleged that Law 132, which can be seen as a companion to Law 109, is unconstitutional under the Foreign Commerce Clause. Sections 9(a) and 9(b) of Law 132 require that bags of cement be labeled with a warning indicating that foreign cement cannot be used in projects using funds from the federal government or the government of Puerto Rico. The warning states, "...according to federal laws (41 U.S.C. sec. 10(a) et seq.) and the laws of Puerto Rico (Law 109 of July 12, 1985) this cement cannot be used in construction works of the Government of the United States and Puerto Rico, nor in works financed with funds of such governments, except in cases specifically provided by said laws." As the Court today has ruled that Law 109 is unconstitutional, Defendants are not permitted to order that cement bags carry warnings reflecting the language of Law 109. Therefore, the Court **HOLDS** that the portions of Sections 9(a) and 9(b) of Law 132 that impact upon foreign commerce are unconstitutional under the Foreign Commerce Clause. The Court does not address in this opinion whether Law 132 is unconstitutional based on its impact on domestic commerce under the domestic Commerce Clause.

### V. CONCLUSION

The Court **GRANTS** Plaintiff's motion for summary judgment (docket No. 7), **DENIES** Defendants' motion to dismiss (docket No. 14) and **DECLARES** that Law 109, 3 P.R. Stat. Ann. §§ 927–927h, and Law 132. 10 P.R. Stat. Ann. § 167e, sections (a) and (b), as pertaining to the use of foreign cement in construction projects funded by Puerto Rico and/or the United States are unconstitutional under the Dormant Foreign Commerce Clause of the United States Constitution. The Court **ENJOINS** Defendants from enforcing Law 109 and Law 132, sections 9(a) and 9(b) as pertaining to cement produced in foreign countries.

**IT IS SO ORDERED.**