# United States Court of Appeals
## For the First Circuit

---

Nos. 03-2713
    04-1231
    04-1232

ANTILLES CEMENT CORPORATION,
Plaintiff, Appellee,

v.

ANÍBAL ACEVEDO VILÁ, GOVERNOR OF THE COMMONWEALTH
OF PUERTO RICO,* ET AL.,
Defendants, Appellants.

---

PUERTO RICAN CEMENT CORPORATION, INC.,
Intervenor, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Doraliz E. Ortiz-de-Leon, Assistant Solicitor General, with whom Roberto J. Sánchez-Ramos, Solicitor General, and Kenneth Pamias-Velázquez, Deputy Solicitor General, were on brief, for appellants.

---

*By operation of law, Aníbal Acevedo Vilá, who became the eighth elected governor of Puerto Rico on January 2, 2005, has been substituted for his predecessor in office as a party defendant. See Fed. R. App. P. 43(c)(2).

Juan Ramón Cancio, with whom Patricia Ramírez Gelpí, Cancio Covas & Santiago, LLP, Dora L. Monserrate Peñagarícano, Rubén T. Nigaglioni, and Nigaglioni & Ferraiouli Law Offices, PSC were on brief, for intervenor.
Lino J. Saldaña for appellee.

---

May 25, 2005

---

**SELYA**, <u>**Circuit Judge**</u>.  In the proceedings below, the district court declared two statutes enacted by the Puerto Rico legislature — one requiring the use of Puerto Rican cement in publicly funded construction projects and the other requiring special labels for cement manufactured elsewhere — antithetic to the dormant Foreign Commerce Clause of Article I, section 8 of the United States Constitution and enjoined their enforcement.  The defendants (government officials sued in their representative capacities) appeal.  They are joined by an intervenor, Puerto Rican Cement Corporation (PRCC).

Despite the obvious importance of the case, two questions of statutory interpretation — one critical to the resolution of these appeals and another of potential significance — were not addressed below.  Perhaps more troublesome, we do not have a fully developed record to assist us in their resolution.  This unfinished business sends up a red flag:  courts should not hurry to resolve issues of great public import on the basis of incomplete information.  Consequently, we return the case to the district court for further proceedings consistent with this opinion.

## I.  THE STATUTORY SCHEME

On July 12, 1985, the Puerto Rico legislature enacted Law 109, codified at 3 P.R. Laws Ann. §§ 927-927h, which, inter alia, requires the use of "construction materials manufactured in Puerto Rico" in all construction works financed with public funds.  <u>Id.</u> §

-3-

927a. "Public funds" are defined as "funds or guarantees from the Commonwealth or from the United States Government, and those funds provided by federal laws for the purposes of revitalizing the economy." Id. § 927(f).

The scope of the law's application is unclear. The statute states that in "those cases in which a call for bids is required for the contracting of a construction work with public funds," the building specifications must contain a provision mandating the use of Puerto Rican construction materials. Id. § 927a. This section does not expressly limit the law's scope to situations in which the Commonwealth, or an agency of the Commonwealth, is the contracting entity. By contrast, section 927b provides that the law applies to projects not requiring competitive bidding when "the Commonwealth contracts a construction work." Id. § 927b. The law also applies to situations in which the Commonwealth undertakes construction to its own behoof. Id. § 927c. The Puerto Rico Supreme Court has never spoken to the scope of Law 109, nor has it interpreted the relationship among its various sections.

In all events, the requirements of Law 109 are rendered inapplicable in two sets of circumstances. First, the law does not hold with respect to any particular construction material when the cost associated with the use of local, as opposed to off-island, material would exceed a certain percentage set by the Puerto Rico

-4-

Board of Preference for Government Purchases (Preference Board). See id. § 927e(a); see also id. §§ 914a-914k. Second, the law does not apply if indigenous construction materials are not available in sufficient quantity or quality. Id. § 927e(b).

While the statute covers a myriad of construction materials, only one — cement — is specifically defined. See id. § 927(d). "Cement manufactured in Puerto Rico" is described as that cement created from Puerto Rican raw materials, save only for components not available in industrial quantities from Puerto Rican sources. Id. The term "cement" as used in the statute encompasses "cement blocks, pre-mixed concrete, concrete mixed at the site and mixture for plastering." Id.

The statute not only confers the standard statutory exemptions upon cement but also allows the use of off-island cement for up to six months "in a case of force majeure or for causes or reasons beyond the control of the local factory." Id. This six-month window may be extended for up to six additional months if the Preference Board approves. Id.

Law 109's Statement of Motives explains that, at the time of the law's passage, Puerto Rico was experiencing a severe recession in the construction industry. See Act of July 12, 1985, No. 109, 1985 P.R. Laws 378, 379. The cement industry was a prominent player in the construction market, and it had suffered as a result. Id. Expressing concern about the loss of high-paying

jobs and the reduction in the tax base accompanying the decline in the local cement industry, the legislature enacted the law to provide "greatly needed aid for [its] rehabilitation." Id.

There is a second statute at issue here. On September 17, 2001, the Puerto Rico legislature passed Law 132, requiring, inter alia, all bags of cement manufactured outside of Puerto Rico to carry a warning label, in both Spanish and English, stating that "in accordance with the federal laws (41 U.S.C. sec 10a et seq.) and the laws of Puerto Rico (§§ 927 et seq. of Title 3), th[is] cement shall not be used in construction works of the governments of the United States and of Puerto Rico nor in works financed with funds from said governments except in the specific cases established in said laws." 10 P.R. Laws Ann. § 167e(a)(4). Bags of foreign cement that are not so labeled cannot be sold within the Commonwealth. Id. § 167e(b). Law 132's Statement of Motives reiterated that cement is the principal material used in Puerto Rico construction projects. See Act of Sept. 17, 2001, No. 132, 2001 P.R. Laws 637, 638.

## II.  TRAVEL OF THE CASE

On April 30, 2002, Antilles Cement Corporation (Antilles), a Puerto Rico corporation engaged solely in importing foreign-made cement for distribution in the Commonwealth, brought suit against the governor of Puerto Rico and other executive branch

officials in their representative capacities.[1]  The complaint
sought a declaration (i) that Law 109 and Law 132 are
unconstitutional as applied to cement imported from foreign nations
and (ii) that Law 109 is preempted by both the Buy American Act
(BAA), 41 U.S.C. §§ 10a-10d, and section 165 of the Surface
Transportation Assistance Act of 1982 (STAA), Pub. L. No. 97-424,
96 Stat. 2097.  The complaint also sought concomitant injunctive
relief.

Before the Commonwealth answered the complaint, Antilles
filed a motion for summary judgment, appending thereto a series of
affidavits and other exhibits.  These exhibits included a letter
from the Preference Board noting that there were only two
manufacturers of cement in Puerto Rico (PRCC and ESSROC San Juan,
Inc.).  The letter verified that the Preference Board required
indigenous cement to be used in projects subject to Law 109 so long
as it cost no more than 115% of the price of off-island cement.

The Commonwealth asked the court to deny the summary
judgment motion without prejudice on the ground that discovery had
not yet commenced. Subsequently, Antilles abandoned its claim that

---

[1]The other defendants are the Secretary of Justice, the
Secretary of Transportation and Public Works, and the Secretary of
Consumer Affairs.  The current occupants of these offices have been
substituted as defendants by operation of law. See Fed. R. App. P.
43(c)(2).  For simplicity's sake, we refer to the defendants,
collectively, as "the Commonwealth."

the BAA preempted Law 109. At that juncture, the Commonwealth answered the amended complaint.

On October 16, 2003, the district court rejected the Commonwealth's request to deny the summary judgment motion pro forma. See Antilles Cement Corp. v. Calderón, 288 F. Supp. 2d 187, 190-91 (D.P.R. 2003). The court proceeded to decide the merits of that motion. First, it ruled that Antilles lacked standing to raise STAA preemption, as that law only proscribes discrimination against certain domestic construction materials. Id. at 193. Antilles does not challenge this ruling on appeal. Next, the court inquired whether Law 109 and/or Law 132 infringed the dormant Foreign Commerce Clause. Finding that Law 109 discriminated on its face against foreign commerce, the court concluded that the law was "virtually per se invalid." Id. at 199 (citing Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978)). The court deemed the interests asserted by the Commonwealth — essentially, the economic benefits accruing to the local economy — far outweighed by the federal government's interest in "speaking with one voice" with respect to international trade. Id. Relatedly, the court determined that although the Commonwealth was acting as a market participant, the market participant exception was not available to it in a case which, like this one, involved foreign commerce. Id. at 197. Finally, the court inquired whether congressional authorization

-8-

shielded Law 109 from attack under the dormant Foreign Commerce Clause and answered that inquiry in the negative. Id. at 199-201.

Based on this reasoning, the court declared Law 109 unconstitutional. Id. at 201. The court simultaneously held Law 132 unconstitutional to the extent that it required labels on bags of cement that specifically referenced the use restrictions established by Law 109. Id. at 202. It enjoined enforcement of both statutes.

The Commonwealth filed a motion to reconsider or, in the alternative, to alter or amend the judgment. See Fed. R. Civ. P. 59(e). On December 17, 2003, the district court summarily denied the motion. The next day, PRCC moved to intervene for the purpose of prosecuting an appeal. See Fed. R. Civ. P. 24. The putative intervenor asserted that it had an interest protected by Law 109; that its interest would be threatened should the district court's judgment withstand review; and that the government defendants would not adequately represent its interest. On January 15, 2004, the Commonwealth filed a notice of appeal.[2] The following day, the district court granted PRCC's motion to intervene, whereupon PRCC filed a notice of appeal in its own right.

---

[2]The Commonwealth originally had filed a premature notice of appeal on November 14, 2003 (No. 03-2713). The new appeal (No. 04-1231) was intended to supersede that appeal and to encompass the denial of the Rule 59(e) motion. These two appeals and the intervenor's appeal (No. 04-1232) have been consolidated.

In this court, Antilles moved to dismiss PRCC's appeal, arguing that the Commonwealth's second notice of appeal, filed on January 15, 2004, divested the district court of jurisdiction over the motion to intervene.  We denied that motion without prejudice to its renewal before this panel.  PRCC has since moved for intervention at the appellate level.

A federal court of appeals has broad discretion to grant or deny intervention at the appellate level.  See, e.g., Mangual v. Rotger-Sabat, 317 F.3d 45, 62 (1st Cir. 2003).  Since PRCC satisfies all the criteria for permissive intervention, see Fed. R. Civ. P. 24(b), we choose to exercise that discretion affirmatively in this instance.  That ruling puts an end to the procedural contretemps.  Having allowed PRCC to intervene in the Commonwealth's pending appeals, PRCC's own appeal (No. 04-1232) becomes superfluous.

**III.  DISCUSSION**

This case brings into bold relief the principle that federal courts ordinarily "should withhold decision on vexing constitutional questions until consideration of those questions becomes necessary."  Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 350 (1st Cir. 2004) (citing Ala. State Fed'n of Labor v. McAdory, 325 U.S. 450, 461 (1945)); see also Aggarwal v. Ponce Sch. of Med., 745 F.2d 723, 726 (1st Cir. 1984) ("It has long been a basic tenet of the federal courts to eschew the decision of cases on

-10-

constitutional grounds unless and until all other available avenues of resolution were exhausted."). It presents a paradigmatic example of a situation in which constitutional questions have been answered in advance of the demonstrated necessity for their decision.

As framed in the lower court and briefed by the parties on appeal, this litigation centers on novel constitutional questions concerning the reach of the dormant Foreign Commerce Clause and the existence vel non of a market participant exception to that clause. A brief discussion regarding the doctrine is appropriate.

The Constitution gives Congress the authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This affirmative grant of power has a negative aspect, known as the dormant Commerce Clause. See Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 18 (1st Cir. 2000). In general, the dormant Commerce Clause "prevents state and local governments from impeding the free flow of goods from one state to another." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). As such, it "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." Grant's Dairy, 232 F.3d at 18. The dormant Commerce Clause and its doctrinal accouterments

-11-

apply to Puerto Rico as though Puerto Rico were a state. Walgreen Co. v. Rullan, ___ F.3d ___, ___ (1st Cir. 2005) [No. 03-2542, slip op. at 9].

Although the language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce. See Barclays Bank v. Franchise Tax Bd., 512 U.S. 298, 310 & n.9 (1994). This latter application — which, for ease in reference, we shall deem as emanating from the dormant Foreign Commerce Clause — is relatively undeveloped in the Supreme Court's case law. The Court's only iterations of it have come in situations involving state taxation of foreign commerce. See, e.g., Barclays Bank, 512 U.S. 298; Wardair Can. Inc. v. Fla. Dep't of Revenue, 477 U.S. 1 (1986); Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159 (1983); Japan Line, Ltd. v. County of L.A., 441 U.S. 434 (1979).

In those cases, the Supreme Court recognized that, with respect to foreign trade and relations, "the people of the United States act through a single government with unified and adequate national power." Japan Line, 441 U.S. at 448 (internal quotation marks omitted). Consequently, there is a more pressing need for uniformity in the realm of foreign trade; the government must be able to "speak with one voice when regulating commercial relations with foreign governments." Barclays Bank, 512 U.S. at 311 (citation and internal quotation marks omitted). We regard this

-12-

concern as equally vivid in non-tax dormant Foreign Commerce Clause cases.  See Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 68-69 (1st Cir. 1999), aff'd on other grounds sub nom. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000).

The market participant doctrine complicates this constitutional algorithm.  The Supreme Court has held, in cases involving domestic commerce, that "if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities."  S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 93 (1984).  Under this elaboration, states have been shielded when engaged in activities such as purchasing, Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 808-10 (1976), selling commodities produced in a state-owned facility, Reeves, Inc. v. Stake, 447 U.S. 429, 440 (1980), and contracting for the construction of public buildings, White v. Mass. Council of Constr. Employers, Inc., 460 U.S. 204, 205-06, 214-15 (1983).  Withal, this shield has relatively modest dimensions; for example, it does not extend to hybrid proprietary/regulatory activities that have downstream effects in a market in which the state is not a participant.  See, e.g., S.-Cent. Timber, 467 U.S. at 84-85 (holding invalid Alaska's practice of selling state-owned timber with a contractual condition requiring purchasers partially to process the timber before shipping it out of state).

It is uncertain whether the market participant doctrine applies at all in the context of the dormant Foreign Commerce Clause. The Supreme Court has never breached this frontier, although it has insinuated that the doctrine, if viable to any extent in the area of foreign commerce, would have to be more narrowly configured. See Reeves, 447 U.S. at 437 n.9 ("We have no occasion to explore the limits imposed on state proprietary actions by the 'foreign commerce' Clause. . . . We note, however, that Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged."). The issue has arisen sporadically in other courts, and what little case law there is appears to be in some disarray. Compare, e.g., Bethlehem Steel Corp. v. Bd. of Comm'rs, 276 Cal. App. 2d 221, 228-29 (1969) (holding state "Buy American" statute unconstitutional because it interfered with federal foreign affairs power, emphasizing its effect on foreign commerce), with, e.g., Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903, 910 (3d Cir. 1990) (holding market participant exception applicable to Foreign Commerce Clause so as to shield state "Buy American" law); K. S. B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n, 381 A.2d 774, 789 (N.J. 1977) (same). This court has taken pains to leave the question open. See Natsios, 181 F.3d at 65-66.

The district court, perhaps led astray by the parties, ventured to resolve this case by plunging into this complex and

largely undeveloped area of constitutional law. In doing so, however, the court failed to consider two antecedent statutory issues that have the capacity either to eliminate the need for vexing constitutional adjudication or to narrow the constitutional question. In our judgment, these issues — one of which concerns the scope of the BAA and the second of which concerns the proper interpretation of a key aspect of Law 109 — warrant further development. In addition, the insights gleaned by a further examination of the two challenged statutes may have some impact on the question of their downstream effects — a factor that is relevant to assessing the potential applicability of the market participant doctrine.

We turn first to the BAA. Early in the game, Antilles abandoned its claim that the BAA preempts Law 109.[3] See Antilles Cement, 288 F. Supp. 2d at 190 n.1. The BAA remained in the case, however, through the Commonwealth's insistence that the BAA, coupled with Congress's knowing acquiescence in the "Buy American" statutes adopted by several states, furnished evidence of congressional authorization for statutes such as Law 109. The district court brushed aside this argument, stating without elaboration that the BAA "applies only to contracts with federal

_____

[3]Antilles abandoned its claim because of its belief that the BAA did not apply to purchases by the Commonwealth and/or its agencies. Since this opinion calls that premise into question, there is no impediment to the plaintiff's reinstating its preemption argument, should it move to do so in a timely fashion.

agencies, not to contracts involving . . . agencies of the Commonwealth of Puerto Rico." Id.

The text of the BAA seems to contradict this statement. It provides that

> only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use . . . [unless] sufficient and reasonably available commercial quantities and . . . quality [of American-made goods are not available].

41 U.S.C. § 10a. It further provides, with exceptions not relevant here, that "[e]very contract for the construction, alteration, or repair of any public building or public work in the United States" must contain a clause requiring the "contractor, subcontractors, material men, or suppliers" to use only American-made goods unless "the head of the department or independent establishment making the contract" determines that such usage is impracticable or unreasonably expensive. Id. § 10b(a). When used in sections 10a and 10b of the BAA, "[t]he terms 'public use,' 'public building,' and 'public work' shall mean use by, public building of, and public work of, the United States, the District of Columbia, Puerto Rico, American Samoa, the Canal Zone, and the Virgin Islands." Id. § 10c(b) (emphasis supplied). Thus, it is at least arguable that the BAA applies to public works contracts entered into by the

-16-

government of Puerto Rico and requires that Puerto Rico include in those contracts a clause restricting the use of foreign goods. It is also arguable that, if so, Puerto Rico is not free to impose clauses containing restrictions on the use of foreign goods greater than those imposed by federal law. So viewed, the constitutional questions might be avoided by construction of the statute.

We have been able to find only one reported case interpreting the BAA as it pertains to Puerto Rico. See Caribbean Tubular Corp. v. Fernandez Torrecillas, 67 B.R. 172 (D.P.R. 1986), vacated on other grounds sub nom. In re Caribbean Tubular Corp., 813 F.2d 533, 535 (1st Cir. 1987) (per curiam). There, the district court concluded that the BAA applied four-square to procurements and purchases of the Commonwealth. Id. at 174. The court rejected an argument that the statute only covered federal procurement and purchases within Puerto Rico. Id. at 174-75. The court also rebuffed an argument that the Federal Relations Act, 48 U.S.C. §§ 731-731e, which authorized self-government for Puerto Rico, rendered the BAA locally inapplicable. Id. at 175-76.

The language of the BAA is suggestive and that language, reinforced by the reasoning of the Caribbean Tubular court, gives us pause. Although we hesitate to say with certainty — after all, neither side has briefed the issue —  both the BAA and Law 109 appear at first blush to forbid the use of foreign construction materials unless their domestic counterparts are unavailable in

-17-

sufficient quantities or qualities. Indeed, the parallels between the BAA and Law 109 are remarkable. The BAA forbids the use of foreign materials in public works, but gives "the head of the department or independent establishment making the contract" authority to determine when to grant exemptions from that rule based on impracticability or expense. 41 U.S.C. § 10b(a). Law 109 forbids the use of foreign materials in public works and directs an independent establishment — now the Preference Board — to authorize exceptions if domestic goods are unavailable or markedly more costly. 3 P.R. Laws Ann. § 927e.

Notwithstanding these similarities, there are some salient differences between Law 109 and the BAA.[4] For instance, the BAA permits the use of foreign goods if it is in the "public interest," 41 U.S.C. § 10d, and Law 109 does not contain such an exception. There are also disparities between the BAA and Law 109 as the former has been interpreted in federal regulations. One such disparity is that the preference for domestic construction materials in procurement by federal agencies is 6%, see 48 C.F.R. § 25.204(b), whereas the Preference Board currently sets the preference for purposes of Law 109 at 15%. Furthermore, the BAA

---

[4]Among other things, Law 109 goes well beyond the BAA in that it forbids procurement of American cement not manufactured in Puerto Rico. Because Antilles does not contest the lower court's finding, Antilles Cement, 288 F. Supp. 2d at 193, that it lacks standing to challenge the provisions of Law 109 insofar as those provisions apply to American-made cement manufactured off-island, we need not dwell upon this difference.

requires contracts for construction of public buildings to favor items manufactured in the United States that are "substantially all" composed from American raw materials. 41 U.S.C. § 10b. The applicable federal regulation defines "substantially all" as meaning at least 50%. See 48 C.F.R. § 25.101(a)(2). In contradistinction, Law 109 seems to require that cement be manufactured 100% from indigenous (Puerto Rican) raw materials, save for those indigenous materials that are unavailable in commercial quantities. See 3 P.R. Laws Ann. § 927(d).

Viewed in this light, one might reasonably question whether Law 109, in its differential treatment of foreign goods, is consistent or inconsistent with federal law. This question can be explored on remand, along with the related questions of whether the BAA essentially preempts Law 109, see Natsios, 181 F.3d at 73-77, or whether it represents direct congressional authorization for that law. See N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n, 198 F.3d 1, 9 (1st Cir. 1999) (noting that discriminatory state legislation may be shielded from dormant Commerce Clause scrutiny if congressional consent is "expressly stated or made unmistakably clear" (citation and internal quotation marks omitted)); Houlton Citizens' Coalition, 175 F.3d at 184 (explaining that "[t]he dormant Commerce Clause does not affect state or local regulations directly authorized by Congress"). If the final question were to be answered in the affirmative — a

-19-

matter on which we take no view — that answer would cast doubt upon the district court's holding that, in enacting the BAA, "Congress has given express approval for restrictions on the use of foreign materials in federally-funded construction projects . . . [but] has not granted similar approval for laws prohibiting the use of foreign materials in . . . construction projects [funded by the Commonwealth of Puerto Rico]." Antilles Cement, 288 F. Supp. 2d at 201. After all, the district court predicated this holding on the assumption, quite possibly incorrect, that the BAA did not expressly apply to Puerto Rico.

There is another unanswered question looming here. We already have mentioned the market participant doctrine. Even were we to assume that the doctrine applies in this context — a matter on which we take no view — it is readily evident that determining whether particular state activity constitutes market participation would require a clear understanding of what the state is doing.

The record in this case does not furnish the basis for such an understanding. One problem is that the scope of Law 109 is unclear. On its face, section 927a does not appear to limit the law's application to government contracts for construction goods and services, but, rather, to reach all competitively bid construction projects subsidized to any extent by either the Commonwealth or the federal government. Notwithstanding the breadth of the language contained in section 927a, however,

-20-

sections 927b and 927c seem less expansive.  Whether the latter two provisions act to narrow section 927a is an open question.

Without discussing this tension, the district court assumed that Law 109 was limited to public works projects.  See Antilles Cement, 288 F. Supp. 2d at 189.  Based on that assumption, the court concluded that Puerto Rico was acting as a market participant with respect to construction goods and services.  Id. at 194.  Whatever the lower court may have been told — the record is silent on the subject — we have been given reason to doubt its underlying assumption.

At oral argument in this court, we queried the parties as to whether Law 109 applies to private development projects for which either the Commonwealth or the federal government provided some funding (say, a grant to an entrepreneur building housing for the elderly).  The Commonwealth and Antilles, who have agreed on little else during the currency of this litigation, both asserted that Law 109 would apply in such situations.[5]  The intervenor disagreed, maintaining that the law only applies to public works.  Remarking the obvious — that the Commonwealth would be hard-pressed to portray itself as a market participant if the statute regulated private sector construction — we invited supplemental briefing.

_____

[5]Antilles's counsel further asserted that, as a result of this law, Antilles had been unable to sell off-island cement products to private developers.  There are no facts in the record that either support or contradict that assertion.

The supplemental briefs provide scant assistance. Antilles elected not to file one. The Commonwealth made a complete about-face and took the position that Law 109 only applies to public works. The intervenor remained steadfast in its view, noting that the title of Law 109 describes it as providing "for the use of all types of construction materials manufactured in Puerto Rico in the public works and buildings to be constructed, reconstructed, preserved or repaired with public funds." 1985 P.R. Laws at 378. As the title of an act may shed some light on its meaning, E. Mt. Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 499 (1st Cir. 1994), this is helpful — but far from conclusive.

A second obstacle impedes our effort to gauge Law 109's reach: the record is devoid of any factual evidence of custom, usage, or administrative practice. While the docket does contain a translation of the Preference Board's "Guidelines for the Interpretation and Application of Laws" — a document compiled in 2002 that discusses Law 109 — those guidelines do not purport to be definitive with respect to the law's scope.[6] To add to the mystery, the local courts have had virtually no occasion to discuss Law 109. Given this apparent void, evidence of custom, usage, and

---

[6]The most relevant datum contained in the guidelines is a footnote stating that Law 109 "is applicable to government entities . . . and also to contractors and their subcontractors who perform construction work under government contracts" (emphasis supplied).

administrative practice is likely to be useful. The statute is now almost twenty years old. If the agencies charged with enforcing its command consistently have interpreted the language one way or another, that fact may prove to be of considerable assistance in determining the statute's meaning. See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir. 2001) (holding that deference is owed to state agency's interpretation of state law); Zambrana v. Gonzalez, 145 P.R. Dec. 616, 639 (P.R. 1998) (stating that "the administrative interpretation given to an act by the [Commonwealth] agency in charge of enforcing it deserves great weight and deference").

These issues — the applicability of the BAA to Puerto Rico, its significance (if any) as a sign of either congressional authorization for or inconsistency with Law 109, the scope and proper interpretation of Law 109, and the custom, usage, and administrative practice that has gone before — are important. Singly or in combination, they have the potential of allowing a court to avoid, or at least to frame more precisely, a potentially difficult constitutional inquiry. Yet, these issues remain virgin territory. They have not been briefed or argued; they have not been vetted in the district court; and they have not been the focus of any discovery.

In the past, we have not shied from remanding cases when significant questions of fact or law have been insufficiently

considered by the parties or the trial court.  See, e.g., Anderson v. Boston Sch. Comm., 105 F.3d 762, 769 (1st Cir. 1997); In re San Juan Dupont Plaza Hotel Fire Litig., 45 F.3d 564, 568-69 (1st Cir. 1995); see also 28 U.S.C. § 2106 (stating that appellate courts "may remand [a] cause and . . . require such further proceedings to be had as may be just under the circumstances").  This makes good sense, as the district court is in the best position to develop the record regarding previously overlooked issues, to examine their factual foundations, and to explore their legal ramifications.  We elect to follow that salutary praxis here.

We do not limit this disposition to the issues surrounding Law 109.  The lower court's decision to declare Law 132 unconstitutional is inextricably intertwined with, and ostensibly justified by, its decision anent the constitutionality of Law 109. See Antilles Cement, 288 F. Supp. 2d at 202 ("As the Court today has ruled that Law 109 is unconstitutional, Defendants are not permitted to order that cement bags carry warnings reflecting the language of Law 109.  Therefore, the Court holds that the portions of . . . Law 132 that impact upon foreign commerce are unconstitutional under the Foreign Commerce Clause.").  We therefore remand the Law 132 issues as well and direct the district court to reconsider its ruling with regard thereto in light of the additional information (factual and legal) that it will glean in the course of the remand.

-24-

## IV. CONCLUSION

We need go no further.  For the reasons elucidated above, we remand to the district court for further proceedings consistent with this opinion.  While we vacate the court's declaratory judgment, we do not vacate the existing injunction at this time.  We believe that the more orderly course is for the district court, on remand, to consider whether the usual criteria counsel in favor of preliminarily enjoining enforcement of the statutes <u>pendente lite</u>.  <u>See</u>, <u>e.g.</u>, <u>Ross-Simons of Warwick, Inc.</u> v. <u>Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996) (limning four-part test for preliminary injunctive relief); <u>Narragansett Indian Tribe</u> v. <u>Guilbert</u>, 934 F.2d 4, 5 (1st Cir. 1991) (same).  The district court should make that determination within ninety days of the date of this court's judgment.  <u>Cf.</u> <u>Langlois</u> v. <u>Abington Hous. Auth.</u>, 207 F.3d 43, 52 (1st Cir. 2000) (remanding but maintaining the status quo for a limited period of time while affording the parties and the trial court an opportunity to develop arguments about new issues not previously addressed in the trial court).  We intimate no view on the outcome of this or any other issue in the case.

**Appeal No. 04-1232 is dismissed as moot**.  **The remaining appeals are terminated and the case remanded to the district court with instructions as contained herein**.  **All parties shall bear their own costs**.  **So ordered**.

-25-