OPINION OF THE COURT
Jeffrey K. Oing, J.
Defendant, Jinglong Industry and Commerce Group Co., Ltd., moves, pursuant to CPLR 3211 (a) (2), for dismissal of the amended complaint for lack of subject matter jurisdiction.
Background
The amended complaint alleges as follows: plaintiff, Hemlock Semiconductor Pte. Ltd., is a Singapore private limited company, whose principal place of business is in Singapore, and is a wholly-owned subsidiary of Hemlock Semiconductor Corporation, a Michigan corporation. It is a leading manufacturer of polycrystalline silicon that is used in manufacturing photovoltaic wafers, ingots, solar cells, and solar modules. Jinglong is a Chinese limited corporation, whose principal place of business is located in Hebei, China. It is principally engaged in manufacturing and distributing the same type of products manufactured by Hemlock.
The amended complaint goes on to allege that on May 4, 2011, the parties entered into a “Long Term Supply Agreement IVB” (supply agreement), pursuant to which Jinglong agreed to purchase, and Hemlock agreed to supply, solar grade polycrystalline silicon (product). Jinglong agreed to purchase specified *326 annual quantities of the product for a period of years. It also agreed in the supply agreement to make a “non-refundable, unconditional, irrevocable advance payment” to Hemlock (advance payment) in the amount of $34.5 million, payable in installments. Jinglong agreed that it would “take or pay” for the product. The term of the supply agreement is from May 4, 2011 through December 31, 2020. Jinglong paid only the first installment of the advance payment.
According to the allegations, on January 9, 2013, August 19, 2013, and January 23, 2014, Hemlock issued default notices to Jinglong for its alleged failure to make its contractual advance payment installments. Hemlock alleges that to date Jinglong has not paid Hemlock any of the invoiced defaulted amounts due under the supply agreement, but has demonstrated that it does intend to honor its contractual payment obligations.
The amended complaint sets forth three causes of action: (1) breach of contract based on Jinglong’s failure to pay amounts owed; (2) anticipatory breach of contract; and (3) an account stated. Hemlock claims that it has been damaged in an amount to be determined at trial, but not less than $41,442,000.
According to the amended complaint, Jinglong is subject to personal jurisdiction in this court pursuant to General Obligations Law §§ 5-1401 and 5-1402 because the supply agreement is for an amount greater than $1 million, and is governed by the laws of the State of New York (amended complaint ¶ 4).
General Obligations Law § 5-1401 provides, in relevant part:
“1. The parties to any . . . agreement ... in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such . . . agreement . . . bears a reasonable relation to this state.”
Section 5-1402 (1) provides:
“Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, including, but not limited to, paragraph (b) of section thirteen hundred fourteen of the business corporation law . . . , any person may maintain an action or proceeding against a foreign *327 corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any . . . agreement . . . for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a[n] . . . agreement ... in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.”
Section 22 of the supply agreement provides:
“Choice of Law. This Agreement is made in, and shall be governed and controlled in all respects by the laws of, the State of New York, U.S.A. (specifically disclaiming the United Nations Convention on Contracts for the International Sale of Goods), and all disputes, including those related to interpretation, enforceability, validity, and construction, shall be determined under such laws, all without giving any effect to any choice or conflict of law provision or rule that would cause application of the laws of any jurisdiction other than that set forth in this section.”
Section 23 provides, in relevant part:
“Choice of Forum: Time Period. The parties submit to the exclusive jurisdiction of the state and federal courts of the State of New York, U.S.A. for all disputes and actions arising, directly or indirectly, out of this Agreement, the performance of this Agreement, or the breach of this Agreement.”
The Parties’ Contentions
Jinglong argues that section 5-1402 does not apply here because it can only apply where there has been a contractual choice-of-law provision made pursuant to section 5-1401. No such choice-of-law could have been made, however, because, Jinglong argues, to the extent that section 5-1401 purports to authorize the application of New York law to transactions and parties that have no connection to or relationship with New York, as is the case here, it violates the Commerce Clause of the United States Constitution, and the Due Process Clause.
With respect to the Commerce Clause, Jinglong argues that section 5-1401 is a per se violation of that clause because its *328 extraterritorial reach directly regulates commerce taking place wholly outside of New York. Because section 5-1401 was intended to override the common-law rule that precluded New York courts from applying New York law to transactions that have no reasonable connection to New York, even if the parties had agreed that New York law should apply, Jinglong asserts that section 5-1401 exceeds the limitations imposed on states by the Commerce Clause, and this court should invalidate the statute as unconstitutional, at least when applied to the circumstances presented here.
Jinglong also contends that section 5-1401 exceeds the limitations on state actions imposed by the Due Process Clause. Under the Due Process Clause, a state cannot apply its own law to a transaction or occurrence if the application of that law would be arbitrary or fundamentally unfair. As such, section 5-1401 is unconstitutional and, therefore, is invalid.
Lastly, Jinglong posits that a contractual choice-of-law provision will only be enforced if the chosen state has a substantial relationship to the dispute or the parties. Here, the contractual selection of New York law contained in section 22 of the supply agreement would not be enforceable because neither party has any significant contacts with New York, nor does the contract have any reasonable relationship to New York.
Jinglong then continues and argues that this action is governed by Business Corporation Law § 1314 (b), which precludes certain suits by one foreign corporation against another. Jinglong argues that section 1314 (b) applies because both Hemlock and it are foreign corporations, and none of the exceptions set forth in paragraphs (l)-(5) is available.
In opposition, Hemlock avers that section 5-1402 has provided the jurisdictional basis for more than 100 multimillion dollar actions in New York State over the past six years, including more than 10 in this court alone. Hemlock asserts that the statute has no impact or effect on any trade, market, or industry. Instead, it instructs that where parties have agreed that New York law will govern the contract New York courts will not conduct the usual conflict-of-law analysis, but instead will apply New York law without further inquiry. Even if the statute did regulate commerce, its effect would be confined to the State of New York and its courts. In fact, Hemlock points out that the statute (1) does not restrict the free flow of trade across borders; (2) does not impose a commercial scheme that supersedes the laws of another state; (3) does not require that *329 other states apply New York law; and (4) does not in any way impede another state from passing its own version of the statute for use within its own courts and borders. Under these circumstances, Hemlock contends that section 5-1402 does not violate the Commerce Clause.
As for the Due Process Clause, Hemlock argues that the enforcement of a bargained-for choice-of-law provision actually ensures fairness and protects the parties from the arbitrary application of an unanticipated body of laws. Moreover, Hemlock contends that there is significant contact with New York because sophisticated global commercial actors, in a multimillion dollar agreement, chose New York law to govern their contract. In fact, Hemlock reminds this court that Jing-long is a sophisticated global actor who negotiated and executed the supply agreement with full knowledge of its terms.
Hemlock also argues that although Business Corporation Law § 1314 (b) might bar this court from hearing a dispute between two foreign corporations this court can exercise jurisdiction here because the contract has: (1) a value greater than $1 million; (2) a provision calling for the application of New York law; and (3) a provision in which the parties submit to the jurisdiction of the courts of New York. The subject matter jurisdiction conferred on this court pursuant to General Obligations Law § 5-1402 does not depend on the enforceability of section 5-1401—it arises directly from the supply agreement.
Hemlock also states that the supply agreement provides not only that the it will be governed and controlled by New York law, but also that “[t]he Agreement is made in . . . the State of New York, U.S.A.” (Supply agreement ¶ 22.) Thus, Hemlock contends that this court has jurisdiction over this dispute pursuant to section 1314 (b) (1), which provides that the court has jurisdiction to hear an action “[w]here it is brought to recover damages for the breach of a contract made . . . within this state.”
Discussion
First and foremost, the Court of Appeals, relatively recently, upheld a contractual provision utilizing section 5-1401, by holding that “the need for a conflict-of-laws analysis is obviated by the terms of the parties5 agreement,” and stating further:
“Section 5-1402 (1) opened New York courts up to parties who lacked New York contacts but who had (1) engaged in a transaction involving $1 million or *330 more, (2) agreed in their contract to submit to the jurisdiction of New York courts, and (3) chosen to apply New York law pursuant to General Obligations Law § 5-1401. The statutes read together permit parties to select New York law to govern their contractual relationship and to avail themselves of New York courts despite lacking New York contacts” (IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A., 20 NY3d 310, 312, 315 [2012], cert denied 569 US 994 [2013]).
The fact that the decision does not indicate that there was a constitutional challenge to sections 5-1401 or 5-1402 is of no consequence given the clear import of the Court’s holding. Further, although the IRB-Brasil Resseguros, S.A. Court, and the Appellate Division, First Department decision which it affirmed, did not mention that the dispute had any relation to New York, the facts were clear. The complaint alleged jurisdiction based solely on section 5-1402, the presently challenged statute. Plaintiff IRB-Brasil Resseguros, S.A. was identified as a 50% state owned Brazilian corporation, defendant Inepar S.A. Industria e Construe pes was identified as a Brazilian power company, which held a 60% stake in defendant Inepar Investments, S.A., a Uruguayan corporation (IRB-Brasil Resseguros, S.A., 20 NY3d at 312-313). Notwithstanding this holding, supra, consideration of Jinglong’s constitutional challenge is still warranted.
The lack of a prior constitutional challenge is not ipso facto an indication of constitutionality. The question that remains is whether Jinglong, as the party challenging a “duly enacted statute” has met its “initial burdern of demonstrating the statute’s invalidity beyond a reasonable doubt” (Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013] [internal quotation marks omitted]). “Legislative enactments enjoy a strong presumption of constitutionality,” and, as the Court of Appeals has cautioned, “courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional” (id.).
Generally, courts will enforce choice-of-law clauses and “contracts should be interpreted so as to effectuate the parties’ intent” (Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d 466, 470 [2015]). “[A] choice-of-law provision in a contract ‘may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship’ ” *331 (id., quoting Mastrobuono v Shearson Lehman Hutton, Inc., 514 US 52, 59 [1995]). Indeed, “[s]ection 5-1401 embodies the legislature’s desire to encourage parties to choose the New York justice system to govern their contractual disputes” (Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d at 472). Furthering this rationale, in a proceeding to enforce an arbitration agreement, the Federal District Court described the choice-of-law and forum-selection clauses in international contracts as “ ‘almost indispensable precondition[s] to achievement of the orderliness and predictability essential to any international business transaction’ ” {Lehman Bros. Commercial Corp. v Minmetals Intl. Non-Ferrous Metals Trading Co., 179 F Supp 2d 118, 138 [SD NY 2000], quoting Scherk v Alberto-Culver Co., 417 US 506, 516 [1974], reh denied 419 US 885 [1974]).
Jinglong first argues that section 5-1401 violates the Commerce Clause of the US Constitution, at least as applied to the facts presented here. “The Constitution gives Congress the authority ‘[t]o regulate Commerce with foreign Nations, and among the several States’ ” (Antilles Cement Corp. v Acevedo Vila, 408 F3d 41, 46 [1st Cir 2005], citing US Const, art I, § 8, cl 3). Indeed, the First Circuit observed that
“[t]his affirmative grant of power has a negative aspect, known as the dormant Commerce Clause. In general, the dormant Commerce Clause ‘prevents state and local governments from impeding the free flow of goods from one state to another.’ As such, it ‘prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” {Id. [internal quotation marks and citation omitted].)
In those cases where courts have found a statute unconstitutional, the statute had the “practical effect” of directly regulating commerce beyond the borders of the state. Clearly, such is not the case here.
For example, in Healy v Beer Institute (491 US 324 [1989]), relied on heavily by Jinglong, the State of Connecticut enacted a law to ensure that out-of-state shippers of beer would sell their products to Connecticut wholesalers at prices that were no higher than the prices at which those products were offered for sale in the States of Massachusetts, New York, and Rhode Island. Unquestionably, the statute directly affected a specific area of commerce, and had the practical effect of regulating prices in the beer industry among four specific states. The *332 United States Supreme Court held that the law violated the Commerce Clause because it had “the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State,” and that the “practical effect” was “to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude” (id. at 337).
Here, there is no such tangible interference in foreign jurisdictions. Moreover, in Healy, the statute was imposed on all beer shippers seeking to do business in Connecticut, whereas here, the parties, themselves, voluntarily consented to the law that is now being challenged by one of the parties. More importantly, section 5-1401 has no effect whatsoever on international commerce because it only pertains to New York law. That New York law differs from Chinese law, as indicated by the affidavit of Professor Bing Ling on behalf of Jinglong, is inconsequential because this dispute is limited to the facts herein and, as such, there is no impact on international commerce as a whole. In fact, contrary to Jinglong’s conclusory assertion, adjudicating this litigation will merely impact the parties’ private contractual obligations—(1) breach of contract for Jinglong’s alleged failure to pay amounts owed; (2) anticipatory breach, alleging that Jinglong has demonstrated that it does not intend to perform its obligations to purchase all product pursuant to the supply agreement; and (3) an account stated based on invoices and sent notices to Jinglong for amounts due under the supply agreement.
Jinglong continues to maintain, however, that section 5-1401 is unconstitutional and relies on Experience Hendrix, L.L.C. v HendrixLicensing.com, LTD (766 F Supp 2d 1122, 1143-1146 [WD Wash 2011]). Its reliance is misplaced. The facts of that case demonstrate that the controversy there would actually affect commerce, and impact events that go far beyond the issue of whether a party is obligated to pay for goods supplied or offered to be supplied by another party, as is the situation here. In Experience Hendrix, L.L.C., the plaintiffs contended that the defendants violated the Lanham Act, the Washington Consumer Protection Act (CPA), and state common law, by using certain business names, domain names, and logos. Allegations pertaining to the preservation of the legacy of Jimi Hendrix were partially at issue, and the plaintiffs alleged that “public misrepresentations concerning exclusive control over the ‘name, likeness, and image’ of Jimi Hendrix violate the CPA” *333 (id. at 1129). In their action, the plaintiffs sought to inhibit the defendants from employing various song titles and lyrics and using stylized renditions of the names “HENDRIX” and “JIMI HENDRIX.” The defendants, on the other hand, sought judicial declarations that 2008 amendments to the Washington Personality Rights Act (WPRA) did not apply to Jimi Hendrix, and that the defendants may “trade in original images and likenesses of Jimi Hendrix” without infringing the plaintiffs’ trademark rights (id.). Based on these facts, this action and Experience Hendrix, L.L.C. have differing purposes such that the latter has no persuasive precedential value, as aptly foretold by the Federal District Court’s commentary:
“These allegations implicate the ‘right of publicity’ Experience covets and the very statute Experience wishes this Court to ignore. Thus, despite all efforts to the contrary, Experience cannot escape the fundamental issue in this case, namely whether the 2008 amendments to the WPRA had the effect of vesting in Experience any right of publicity relating to Jimi Hendrix such that Experience may preclude defendants from trading in images of, or art created by, Jimi Hendrix.” (Id. at 1130.)
Jinglong also relies on Gravquick A/S v Trimble Nav. Intl. Ltd. (323 F3d 1219 [9th Cir 2003]). That action involved a Danish corporation that imported construction equipment into Denmark for sale in the Danish market. Trimble Navigation International Ltd. was a California corporation that manufactured global positioning system devices. The parties entered into an “International Distributor Agreement” (IDA) that made Gravquick A/S a distributor of Trimble products in Denmark, and that provided that it would be governed under California law.
Gravquick sued Trimble claiming a violation of the California Equipment Dealers Act (CEDA) by refusing to renew the IDA without good cause and proper notice. Trimble, counterclaiming for nonpayment of a debt, moved for summary judgment on both parties’ claims contending that the CEDA did not apply to the IDA because Gravquick was a dealer located outside of California, and the nonrenewal decision was made in England, not California. The Ninth Circuit rejected the argument.
The appeals court found that the CEDA regulates the business relations between independent dealers of agricultural, *334 utility, and industrial equipment, as well as the manufacturers, wholesalers, and distributors of such equipment. Under those circumstances, it held that the CEDA was applicable to the action given that the “CEDA, as applied in this case, does not violate the Commerce Clause by directly regulating commerce entirely outside of California, because the contract here is, by the parties’ choice, governed by California law, was performed in part in California, and involves a California corporation” {id. at 1224).
Jinglong’s reliance on Gravquick A/S to support its argument is misplaced. Here, although the forum contacts may not be as extensive as that in Gravquick A/S, the clear import of Gravquick AJS is that where parties voluntarily by their agreement submit to a specific forum, like New York, for jurisdictional purposes and to apply that forum’s law, the Commerce Clause is not violated.
Based on the foregoing, Jinglong has failed to sustain its heavy burden of demonstrating that section 5-1401 violates the Commerce Clause of the US Constitution.
Jinglong has also failed to demonstrate that the statute violates the Due Process Clause of the US Constitution. In the leading decision of Allstate Ins. Co. v Hague (449 US 302 [1981], reh denied 450 US 971 [1981]), Justice Brennan observed:
“The lesson from Dick and Yates, which found insufficient forum contacts to apply forum law, and from Alaska Packers, Cardillo, and Clay II, which found adequate contacts to sustain the choice of forum law, is that for a State’s substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair. Application of this principle to the facts of this case persuades us that the Minnesota Supreme Court’s choice of its own law did not offend the Federal Constitution.” {Id. at 312-313.)
The cases relied upon in Allstate, however, did not involve a situation where sophisticated commercial entities, such as here, entered into a contractual arrangement of significant value, and which contained a choice-of-law provision. The Allstate Ins. Co. Court expressly acknowledged that it was deciding a constitutional choice-of-law question {id. at 308).
*335 Here, the parties expressly and knowingly waived the giving of “any effect to any choice or conflict of law provision or rule that would cause application of the laws of any jurisdiction other than that set forth in this section” (supply agreement § 22). Allstate Ins. Co., and the cases cited therein, involved circumstances such as an automobile accident, an employee injury, and a claim of misrepresentation in the application of an insurance policy. In those cases, substantial relationship to the forum had clear, evident due process concerns, which are not present here, which involve the artificial device of a contractual arrangement that the parties themselves devised. Within this contractual context, the parties chose all of the terms of their business arrangement, including choice of law and forum (see Indian Harbor Ins. Co. v City of San Diego, 972 F Supp 2d 634, 648 [SD NY 2013], affd 586 Fed Appx 726 [2d Cir 2014]).
In Indian Harbor, the plaintiff, Indian Harbor Insurance Company, brought an action against the City of San Diego seeking a declaratory judgment that it had no duty to defend or indemnify the City for three pollution liability claims made against it. The insurance policy at issue contained a New York choice-of-law provision and insured risks in the State of California. The parties disputed “whether, under New York common law, Indian Harbor must show that it was prejudiced by any unreasonable delays in notifying Indian Harbor of any claims under the policy,” and also “whether New York law can constitutionally be applied to a dispute over pollution claims in California” (972 F Supp 2d at 637). The defendants (the City of San Diego and two intervenors) argued that it would be unconstitutional for the court to apply New York law to the parties’ insurance coverage dispute (id. at 652).
The Indian Harbor court held that “[w]hen the parties have contractually agreed to the application of New York law to a monetarily significant transaction, it would require extraordinary circumstances to find that choice of law to be unconstitutional” (id.). The Federal District Court determined that its ruling was not inconsistent with the constitutional contacts analysis required under Allstate Ins. Co., which “effectively boils down to a question of ‘whether a court’s application of its own state’s law is arbitrary or fundamentally unfair,’ and it is hardly unfair or arbitrary to honor the contractual choice of the parties in a substantial transaction” (Indian Harbor Ins. Co. v City of San Diego, 972 F Supp 2d at 652, quoting Lehman *336 Bros. Commercial Corp. v Minmetals Intl. Non-Ferrous Metals Trading Co., 179 F Supp 2d at 137, and citing Tosapratt, LLC v Sunset Props., Inc., 86 AD3d 768 [3d Dept 2011]).
The Indian Harbor court also quoted IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (83 AD3d 573, 574 [1st Dept 2011], affd 20 NY3d 310 [2012], cert denied 569 US 994 [2013]): “The enforcement of such clauses is favored since it protects] the justifiable expectation of the parties who choose New York law as the governing law in international financial transactions.” (83 AD3d at 574 [internal quotation marks and citation omitted].) To be sure, the Indian Harbor court made clear that constitutional challenges in the contractual context require less judicial scrutiny:
“Against this background, there can be no question that enforcement of the parties’ choice-of-law clause poses no constitutional problem. The parties freely decided to have New York law applied to this substantial dispute and also agreed in their contract on a New York venue for certain disputes. Indian Harbor has significant contacts with New York, including its New York office, out of which its CEO-President-Chairman, its General Counsel, and four of its eight corporate directors operate .... Moreover, Indian Harbor is authorized to issue insurance liability policies in New York, and it regularly issues policies that insure locations in New York and parties domiciled in New York.” (972 F Supp 2d at 653.)
That the facts present there are stronger than here, however, does not negate the court’s earlier clear statement that “[w]hen the parties have contractually agreed to the application of New York law to a monetarily significant transaction, it would require extraordinary circumstances to find that choice of law to be unconstitutional” (id. at 652). Indeed, along those same lines, in the context of the financial category of letters of credit, the Appellate Division, First Department has held that as “a primary financial center and a clearinghouse of international transactions, the State of New York has a strong interest in maintaining its preeminent financial position and in protecting the justifiable expectation of the parties who choose New York law as the governing law of a letter of credit” (Banco Nacional De México, S.A., Integrante Del Grupo Financiero Banamex v Societe Generale, 34 AD3d 124, 130 [1st Dept 2006]).
Other cases cited by Jinglong did not involve the situation such as the one present here where the parties contractually *337 agreed upon the application of a particular state’s law as well as other distinguishing features (see e.g. Gelicity UK Ltd. v Jell-E-Bath, Inc., 2013 WL 3315398, *5, 2013 US Dist LEXIS 92236, *13-15 [ED NY, July 1, 2013, No. 10 Civ. 5677(ILG)(RLM)] [conflicts of law analysis in trademark infringement action without a choice-of-law provision at issue]; In re General Motors Corp. Dex—Cool Prods. Liab. Litig., 241 FRD 305, 315-318 [SD Ill 2007] [involving a class action, Illinois statute, and an issue as to which state law applied under a conflicts of law analysis, but absent a contractual choice-of-law provision]; In re Parmalat Sec. Litig., 2007 WL 541466, *7-10, 2007 US Dist LEXIS 11767, *22-32 [SD NY, Feb. 22, 2007, No. 04 Civ. 9771(LAK)(DLC)] [complex securities litigation involving Illinois conflict of laws analysis]; Pearson v Northeast Airlines, Inc., 309 F2d 553 [2d Cir 1962], cert denied 372 US 912 [1963] [adminstratrix sued airline for negligence; no choice-of-law provision at issue]).
Jinglong also cites CCR Data Sys. Inc. v Panasonic Communications & Sys. Co. (1995 WL 54380, 1995 US Dist LEXIS 22943 [D NH, Jan. 31, 1995, No. CIV. 94-456-M]), which involved a contractual choice-of-law provision (New York). Although the Federal District Court refused to apply that choice-of-law provision because the transaction bore no relation to that state, it, sitting in diversity, made that determination based on New Hampshire choice-of-law rules:
“In contract cases, New Hampshire follows the approach adopted by the Restatement (Second) of Conflict of Laws, which provides that where parties to a contract select the law of a particular jurisdiction to govern their affairs, that choice will be honored if the contract bears any significant relationship to that jurisdiction.” (1995 WL 54380,*4, 1995 US Dist LEXIS 22943, *11 [internal quotation marks and citation omitted].)
New York law does not compel that kind of analysis.
Finally, because General Obligations Law § 5-1401 is not unconstitutional, the argument challenging General Obligations Law § 5-1402 must fail. Jinglong’s objection to the application of section 5-1402—which provides this court with subject matter jurisdiction over this matter—is based on its challenge to section 5-1401.
Accordingly, it is ordered that defendant Jinglong Industry and Commerce Group Co., Ltd.’s motion to dismiss is denied; *338 and it is further ordered that defendant Jinglong Industry and Commerce Group Co., Ltd. is directed to serve its answer within 10 days after service of a copy of this order with notice of entry.