**WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, et al., Plaintiffs**

v.

**Roberto SANCHEZ RAMOS, et al., Defendants**

**No. CIV. 04–1452(JP).**

United States District Court, D. Puerto Rico.

Aug. 9, 2005.

Nora Vargas–Acosta, Esq., De Jesús, Hey & Vargas Law Office, San Juan, PR, Paul D. Polidoro, Watchtower Bible & Tract Society of New York, Inc., Legal Department, Patterson, NY, for Plaintiffs.

Eduardo A. Vera Ramírez, Esq., Landrón & Vera, LLP, Guaynabo, PR, for Defendants.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

The Court has before it Defendants'[1] "Motion to Dismiss Under Rule 12(b)(6) and Opposition to Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction" (**docket No. 13**), as well as Plaintiffs' opposition thereto (docket No. 16). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' "Motion to Dismiss" (**docket No. 13**).

### II. LEGAL STANDARD FOR A MOTION TO DISMISS

According to the Supreme Court, a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002). Moreover, according to the First Circuit, the Court must "treat all allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff." *Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d 996, 997 (1st Cir.1992). In addition, a "complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under

---

1. As per Fed.R.Civ.P. 25(d)(1), former co-Defendants Sila M. Calderón Serra, in her official capacity as Governor, and Annabelle Rodriguez, in her official capacity as Secretary of Justice, have been substituted as parties by their successors in office, Anibal Acevedo Vilá and Roberto J. Sánchez Ramos, respectively. Co–Defendants Angel David Rodríguez and Luis A. Vélez Roche, who kept their positions following the change of administration in January of 2005, remain Defendants in this matter. All further filings in this matter SHALL reflect the change.

any set of facts that could be established consistent with the allegations." *Gonzalez–Perez v. Hospital Interamericano De Medicina Avanzada,* 355 F.3d 1, 5 (1st Cir.2004). Finally, under Federal Rule of Civil Procedure 8(f), "[a]ll pleadings shall be so construed as to do substantial justice."

## III. *FACTUAL ALLEGATIONS*

Plaintiffs in the case at bar are the Watchtower Bible and Tract Society of New York (hereinafter "Watchtower") and Congregación Cristiana de Testigos de Jehová en Puerto Rico (hereinafter "Congregación"). The Defendants are Hon. Sila María Calderón, the Governor of the Commonwealth of Puerto Rico; Hon. Anabelle Rodríguez, the Secretary of Justice of the Commonwealth of Puerto Rico; Angel David Rodríguez, the Commissioner of the Planning Board of the Commonwealth of Puerto Rico; and Luis A. Vélez Roche, Administrator for the Regulations and Permits Administration. They are sued only in their official capacities.

Watchtower is a corporation utilized by the Governing Body of Jehovah's Witnesses to print and distribute Bible-based books and magazines. Watchtower is, and since 1909 has been, the publisher of numerous Bibles, tracts, magazines, booklets, and books, including the semimonthly magazines entitled *The Watchtower* and *Awake!,* all of which are distributed throughout the United States, including Puerto Rico, and elsewhere. The Governing Body is an ecclesiastical group of elders who provide spiritual direction to Jehovah's Witnesses worldwide. Plaintiffs claim that the primary means by which Watchtower's literature is distributed is through individual Jehovah's Witnesses, who personally distribute them to individuals, primarily by personal contact. Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., is a corporation utilized by the Governing Body of Jehovah's Witnesses to, among other things, administer the 327 congregations of Jehovah's Witnesses located throughout the Commonwealth of Puerto Rico.

Jehovah's Witnesses believe that they have a Bible-based duty to tell others about the contents of the Bible and its importance to people today. The primary method used by individual Jehovah's Witnesses to make personal contact with individuals is by going from door to door throughout residential neighborhoods and to businesses, by meeting people on public streets and in public buildings, and elsewhere as people are willing to discuss such topics. They attribute the origins of their beliefs to several Bible passages at, among other places, Matthew 24:14; Matthew 28:19, 20; Acts 5:42; Acts 20:20, 27; and 2 Timothy 4:1, 2.

There are approximately 25,000 individual Jehovah's Witnesses in Puerto Rico who distribute Watchtower's publications and talk to people about the Bible in the manner described above. Plaintiffs claim that Jehovah's Witnesses have a reputation worldwide in over 235 lands as being well dressed and groomed, and of being peaceful, law-abiding citizens, and that they are well known for their public ministry. As part of their ministry, Jehovah's Witnesses, including those in Puerto Rico, offer home Bible studies without cost to anyone who is interested and offer religious literature without cost to anyone who shows genuine interest in reading it. All preaching and teaching by Jehovah's Witnesses is done voluntarily and without charge. The basis for their doing this work is the Scriptural commission that "without cost I gladly declared the good news of God to you" as stated in the Bible by the apostle Paul at 2 Corinthians 11:7.

On May 20, 1987, the Puerto Rico Legislature passed Law No. 21, "empowering residential associations with the ability to close off their neighborhoods to outsiders." Authority was granted to close off access to public streets in neighborhoods by means of walls and gates. On July 16, 1992, the Puerto Rico Legislature passed Law No. 22, amending portions of Law No. 21 (hereinafter "the Controlled Access Law").

Plaintiffs claim that in the early 1980's, the number of Jehovah's Witnesses in Puerto Rico expanded greatly as a result of the opportunity to take their Bible-based message directly to residents at their homes. Plaintiffs claim that the percentage of growth of Jehovah's Witnesses in Puerto Rico for the years immediately prior to the passage of Law No. 21 was six percent in 1982, seven percent in 1983, five percent in 1984, five percent in 1985, and seven percent in 1986. In 1987, the year of Law No. 21's passage, the growth rate in the membership of Jehovah's Witnesses shrank to four percent. Thereafter, membership growth abated—three percent in 1988, two percent in both 1989 and 1990, three percent in 1991, and only a one percent growth in 1992 and each year from 1994 to 1998. There was no growth in 1993. In 1999, there was a decrease of three percent, followed by no change in 2000, a one percent decrease in 2001, a one percent increase in 2002, and no change in 2003.

Following the passage of the Controlled Access Law, many residential associations throughout Puerto Rico closed their neighborhoods and closed public streets by means of walls and gates. Under authority granted by the Controlled Access Law, 1) checkpoints were established to screen those who wished to continue to travel on public streets and 2) checkpoints were erected to close off access to public streets to those who did not reside therein. Plaintiffs claim that as a result of these governmentally initiated, sanctioned, and enforced restrictions and checkpoints, the ministerial activity of Jehovah's Witnesses has been and is being directly inhibited.

Plaintiffs claim that Jehovah's Witnesses have been denied entrance into urbanizations by security guards, who are at times armed with guns. They further allege that access to public streets has also been prohibited by means of locked gates in urbanizations lacking security personnel, and that Jehovah's Witnesses have been directed to leave neighborhoods by officials of the residential urbanizations. Plaintiffs claim that Jehovah's Witnesses have been prevented from speaking to individuals on public streets, and that they have been prevented from engaging in their door-to-door, public ministry in urbanizations where they themselves are residents.

Furthermore, Plaintiffs further allege that the state police have prevented Jehovah's Witnesses from obtaining access to urbanizations and have removed them from urbanizations to which they had previously obtained access. They further allege that Jehovah's Witnesses have also been threatened with prosecution if they did not remove themselves from public streets located within gated urbanizations.

On April 30, 1997, in an attempt to rectify the inability of Jehovah's Witnesses to engage in their public ministry in gated urbanizations, local representatives of those administering the activities of Jehovah's Witnesses in Puerto Rico testified before the Commission for Municipal Affairs of the House of Representatives. The Commission was considering amending the Controlled Access Law. Local Jehovah's Witnesses testified that the Controlled Access Law had a deleterious impact upon the public ministry of Jehovah's Witnesses island wide. No amendment was enacted.

In a further attempt to resolve the persisting and escalating difficulties caused by the Controlled Access Law, a representative of Plaintiff Watchtower's legal department requested a meeting with the Governor of Puerto Rico. A meeting was held with Governor's Legal Counsel in September 2001, but no resolution was reached. Watchtower thereafter corresponded with the Governor's Legal Counsel on October 26, 2001, and December 26, 2001, requesting that the Commonwealth posit an acceptable resolution. As of the filing of the Complaint in this matter, no response had been received.

Plaintiffs claim that Jehovah's Witnesses have had charges brought against them for engaging in their public ministry within gated urbanizations and that, at other times, they have had to leave gated urbanizations under threat of prosecution. Plaintiffs claim that a genuine threat currently exists that Jehovah's Witnesses will be prosecuted if they participate in their public ministry on public streets within gated urbanizations in Puerto Rico.

## IV. *THE CONTROLLED ACCESS LAW*

The Controlled Access Law was created in response to Puerto Rico's unfortunate crime problem, which seems to grow more serious with each passing year. The Court here takes the opportunity to note that, according to the World Health Organization, in the late 1990's, Puerto Rico had the third-worst murder rate in the world with 41 murders per 100,000 people, exceeded only by Colombia and El Salvador.[2] Puerto Rico currently sports the highest murder rate in the United States.[3] In its

Statement of Motives regarding the passage of the Controlled Access Law, the Puerto Rico Legislature described its rationale for passing the law in the following terms:

The problem of criminality requires short-term as well as long-term planning that will allow us to reach the roots of the problem, as well as concrete and immediate actions that will bring back the peace our people require. We all realize that the participation of the community in this fight against crime is of utmost importance. For that reason, we understand that this measure groups and incorporates certain communities in such function. Urbanizations or communities that have only one access [or more than one, if none of them constitutes a thoroughfare or communication route which has to be passed in order to reach other communities] should be authorized to control the access to their streets within the residential area. In terms of the well-being of the community it would allow them to participate in the fight against crime when the mechanisms that will control the accesses are established, and at the same time it reduces the already overburdened surveillance duties rendered by the Puerto Rico Police. *Statement of Motives*, Act No. 21, May 20, 1987, 1987, 29 P.R. Laws Ann. § 63.

On May 20, 1987, the Puerto Rico Legislature passed Law No. 21; on July 16, 1992, the Puerto Rico Legislature passed Law No. 22, amending portions of Law No. 21, authorizing municipalities to

"grant permits to control motor vehicle traffic and the public use of public thor-

2. *See* Ben Best, *Death by Murder*, http://www.benbest. com/lifeext/murder. html, citing World Health Organization, *World Report on Violence and Health*, (World Health Organization, Geneva, 2002).

3. Taína Rosa, *Detaining Crime in Puerto Rico*, Caribbean Business, January 20, 2005, at 16.

oughfares in pedestrian walkways, streets, urbanizations and public or private residential communities with a single access and exit point or with more than one access or exit point; but that none of their public thoroughfares are used to enter or leave another street, urbanization or community which has not requested access control. Should the streets, urbanizations or communities be part of more than one municipality, jurisdiction shall belong to that municipality in which the greater part of the properties is located." 23 P.R. Laws Ann. § 64 (1999).

The Controlled Access Law delegates power to the municipalities of Puerto Rico to oversee the process of granting permits to urbanizations that wish to institute a controlled access system. 23 P.R. Laws Ann. § 64. The responsibility over the administration and maintenance of the controlled access system falls to a "Residents' Council, Board, or Association, duly organized and registered with the Department of State as a non-profit institution." 23 P.R. Laws Ann. § 64a(d).

The Controlled Access Law spells lays out the procedures to be followed in implementing a controlled access scheme in a community. First, the neighborhood must elect a council, board, or residential association to represent the community during the implementation of the Act. 23 P.R. Laws Ann. § 64a(a). Second, the neighborhood cannot house a building or facility owned by the Commonwealth of Puerto Rico or the municipalities "for the use and enjoyment of the general public." *Id.* at § 64a(b). The Controlled Access Law excludes schools, recreational parks, and community centers from this special protection. *Id.* These buildings or areas, although publicly owned, may be encompassed within a closed community. Third, at least three-fourths (3/4) of the homes

within the community must approve of the plan to close the community. *Id.* at § 64a(c). The cost of financing the installation, the operation, and the maintenance of the system falls on the community that wishes to implement it. *Id.* at § 64a(d).

The Controlled Access Law states that a neighborhood may not keep out people who wish to attend private schools, churches, hospitals, civic clubs, and other similar institutions located within the boundaries of the closed communities. 23 P.R. Laws Ann. § 64b (1999). In addition, the physical barriers installed to prevent outsider access "must not constitute a physical or architectural barrier for disabled citizens." *Id.* Moreover, public employees must have free access to the area. 23 P.R. Laws Ann. § 64c (1999). Residents who oppose the closed community are exempted from paying fees for its installation, operation, maintenance, and removal. 23 P.R. Laws Ann. § 64g (1999).

The Puerto Rico Planning Board ("Board"), the entity authorized to adopt regulations to implement the Act, fortified an opponent's right of free access to the closed community. 23 P.R. Laws Ann. § 64e (1999). The Board's regulation requires that the neighborhoods guarantee residents who oppose the Act free and equal access to the system. *Caquías Mendoza v. Asociación de Residentes de Mansiones de Río Piedras,* 1993 WL 839839, 93 J.T.S. 127 at 11073, 11082 n. 7 (P.R.1993). Residents who properly oppose the controlled access scheme are under no obligation to help finance it or to pay monthly dues for its upkeep, and they must be given beepers or access cards to control their own access, just like those given to paying residents. *Id.*

The practical result of what the Controlled Access Law allows is that residential neighborhoods can exert some measure of control over vehicular and

pedestrian traffic so long as they do not contain certain specified public facilities, or if they do not constitute thoroughfares necessary for travel between one community and another. This is generally achieved by erecting a fence or barrier where an access point used to be, effectively closing it off, and instead leaving one or two operative entrances to the neighborhood, usually manned by a guard.

As is common knowledge to people in Puerto Rico, when a non-resident pedestrian or vehicle wishes to enter the neighborhood, the guard is reached via intercom. The Supreme Court of Puerto Rico, in its landmark decision of *Asociacion Pro Control de Acceso Calle Maracaibo, Inc., v. Cardona Rodriguez, et al.*, 1997 WL 870832, 1997 JTS 127, 144 D.P.R. 1, (P.R. Oct. 31, 1997), in finding that the Controlled Access Law was Constitutional on its face, further clarified the extent to which prospective visitors to an urbanization can be questioned. The *Maracaibo* Court, in examining the Constitutionality of the Controlled Access Law, sought to determine what manner of inquiry was the least intrusive upon the visitor's rights while not frustrating the underlying purpose of the law. *Maracaibo*, 144 D.P.R. at 38. The *Maracaibo* Court concluded that the most equitable balance was reached via an inquiry whereby the guard may ask the visitor for his or her intended destination or the purpose of the visit; if the purpose of the visit is to see a particular resident, the guard, when the resident has given the authorization to do so, may ask for the name of the visitor. *Id.* Failure to adequately provide an answer to this inquiry is deemed a sufficient basis for denying the visitor's entry into the urbanization.[4]

*Id.* at 50, 1997 WL 870832. A written record of a resident's visitors may only be kept if the resident has so authorized, and it may not include information other than the name of the visitor and such information as can be ascertained by plain sight (time of entry and exit, make and model of the vehicle driven, and the license plate number of the vehicle). *Id.* at 39, 39 n. 15, 1997 WL 870832. Such records are to be closely guarded by the Residents' Association charged with the administration and maintenance of the access system; the records are to be used only in furtherance of the policy underlying the passage of the Controlled Access Law, i.e., to assist the police in investigating a crime committed in the area. *Id.* These records may only be kept for a reasonably limited time, after which they must be destroyed. *Id.* The aforementioned requirements apply both to vehicular and pedestrian traffic. *Id.* at 50, 1997 WL 870832.

Furthermore, in order to better balance the rights in question, urbanizations that implement a controlled access scheme must notify or warn all potential visitors regarding what will be asked of them at the entry point; this requirement was enacted so that visitors that do not wish to proffer the information requested have the option of leaving before reaching the entry point. *Id.* at 39–40, 1997 WL 870832. The notification to visitors is to be effected via signs located a reasonable distance from the entry point, and must also include information as to whom the visitors may address complaints or grievances. *Id.* at 40, 1997 WL 870832. Guards at the entry point must be in uniform and identified by a badge containing the guard's full name. *Id.* at 40 n. 16, 1997 WL 870832.

---

4. Failure by the visitor to reveal his or her own name constitutes grounds for a denial of entry only if the resident to be visited has authorized such an inquiry to be made. *Maracaibo,* 144 D.P.R. at 50.

## V. CONCLUSIONS OF LAW

### A. Jurisdictional Arguments

#### 1. Plaintiffs' Associational Standing to Sue

Defendants argue that Plaintiffs Watchtower and Congregación do not have standing to sue on behalf of their members in federal court. The test used in determining whether an organization has standing to sue on behalf of its members was set forth by the Supreme Court in *Hunt v. Washington State Apple Adver. Com'n.*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Playboy Enter., Inc., v. Pub. Serv. Com'n of Puerto Rico*, 906 F.2d 25, 34 (1st Cir.1990), *citing Hunt*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

As stated above, part (a) of the *Hunt* test requires that members of the organization in question would otherwise have standing to sue in their own right in order for the organization to have standing to sue on their behalf. As interpreted by the Supreme Court, part (a) of the *Hunt* test does not require that every member of an association have standing before it can sue on behalf of its members. "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *See Playboy Enterprises*, 906 F.2d at 34; *see also Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2212, 45 L.Ed.2d 343 (1975) (emphasis added) (*citing Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)) (holding that the Sierra Club lacked standing to challenge the U.S. Forest Service's approval of development in the Mineral King Valley because the Club didn't allege that any of its members use the area for recreation). In *Automobile Workers v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Supreme Court held that the first element of the *Hunt* test was met when the plaintiff association showed that "at least some" of its members would have had standing to sue on their own. *Automobile Workers v. Brock*, 477 U.S. 274, 286, 106 S.Ct. 2523, 2530, 91 L.Ed.2d 228 (1986).

Defendants argue that Plaintiffs in this matter do not have standing because "they have articulated their injuries in a too-broad fashion." Defendants' *"Motion to Dismiss"* at 20. The Court, in attempting to parse out the meaning of this over-breadth argument, takes Defendants to mean that the Plaintiff organizations in this matter do not have standing to sue because claims brought by individual members could vary greatly depending on the circumstances; Defendants seem to be arguing that because it is the closed communities that apply the law in question, the claims are too broad because an individual member of the Jehovah's Witnesses would have a different experience in trying to enter each different closed community.

While this may well be true, the Court does not understand how exactly that would bar Plaintiffs' standing under the *Hunt* test. If anything, it seems like an argument in favor of having the organization as the representative plaintiff, as it simplifies matters considerably. In any case, the Court is unconvinced by this argument. Defendants seem to be argu-

ing that because there are too many possible claims that can be filed by individuals, therefore there is no valid claim that the organization could file. The Court disagrees with that logic. It is not uncommon for individuals to bring actions to safeguard their Constitutional rights, and it is clear to the Court that the claims in this case could have been brought individually by a member of the organization in question. Therefore, part (a) of the *Hunt* test is met.

▮▮▮ Part (b) of the test is easily satisfied. In this lawsuit, Plaintiffs seek an action by the Court that would allow them greater freedom to proselytize. As proselytizing is considered by Plaintiffs to be an integral part of the Jehovah's Witness religion, the interests sought to be protected by this lawsuit are germane to the organization's purpose, thereby satisfying prong (b) of the *Hunt* test. As for part (c) of the *Hunt* test, since this is an action for injunctive and declaratory relief, the claim asserted and the relief requested do not require the participation of individual members in the lawsuit.

Furthermore, it must be noted that the Supreme Court has recently decided a case where Watchtower represented the interests of its members, and found no problem with the organization's standing. *See Watchtower Bible and Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 153, 122 S.Ct. 2080, 2083, 153 L.Ed.2d 205 (2002). The Court has seen nothing that would lead it to believe that Plaintiffs lack standing to sue as organizations on behalf of their members in this matter. Therefore, Defendants' motion to dismiss on this argument is hereby **DENIED**.

## 2. Justiciable Case or Controversy

▮▮ Defendants also argue that Plaintiffs have failed to establish a cognizable case or controversy as to Defendants because the named Defendants in this action are not empowered by the Controlled Access Law to petition, administer, or implement any of the articles of the challenged law; Defendants contend that, as such, Defendants have no stake in the case or controversy.

▮▮▮ Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *see also Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988); *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. *Allen v. Wright*, 468 U.S. 737, 750–751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–473, 102 S.Ct. 752, 757–59, 70 L.Ed.2d 700 (1982). Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them," *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), and confines them to resolving "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id., quoting Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). The parties must have a "personal stake in the outcome" of the lawsuit. *Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983),

*quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Defendants' argument on this ground is inapposite. The Supreme Court jurisprudence on this matter focuses on the matter of potential plaintiffs having a sufficient stake in the matter to bring suit. Defendants in this case try to turn that jurisprudence on its head by arguing that they themselves do not have a sufficient stake in the outcome for there to be an actual case or controversy. To say that the government officials sued here as representatives of the government are not sufficiently interested in the outcome of this litigation would be to reach a spurious conclusion.

█ As the Supreme Court has pointed out, a state has standing to defend the constitutionality of its own statutes. *See Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). In this matter, a Puerto Rico statute's constitutionality is being challenged, and high-ranking government officials in their official capacities have a sufficient interest in the matter, as representatives of the state, for there to be an actual case or controversy. Therefore, Defendants' motion to dismiss on these grounds is hereby **DENIED**.

## B. Facial Constitutional Challenges

In their Complaint, Plaintiffs set forth a series of claims attacking the Constitutionality of the Controlled Access Law. Each Constitutional claim in the Complaint is two-fold, constituting both a facial challenge to the Constitutionality of the Controlled Access Law, and also an "as applied" Constitutional challenge to it. Plaintiffs also include a 42 U.S.C. § 1983 claim wherein they allege that "Defendants' passage, implementations, and enforcement of the [Controlled Access] Laws, either directly by Defendants or their agents, servants, and employees were undertaken under color of state law and op-

erates to deprive Plaintiffs and Jehovah's Witnesses of federal rights." Plaintiffs' *Complaint* at 20. The Court will first address Plaintiffs' facial Constitutional challenges, and then address Plaintiffs' "as applied" challenges and their § 1983 claim.

The Court takes this opportunity to note that this is not the first time that a facial challenge has been brought regarding the Constitutionality of the Controlled Access Law. The Supreme Court of Puerto Rico, in *Maracaibo,* facing facial challenges to the Constitutionality of the Controlled Access Law very similar to the ones made in the instant case, has already addressed this question and determined that the Controlled Access Law is Constitutional on its face. *Maracaibo,* 144 D.P.R. at 49 ("In conclusion, today we hold that the Controlled Access Law, as amended, is Constitutionally valid on its face." (Court translation)). While the Court agrees with the determination of the Supreme Court of Puerto Rico, the Court will undertake its own analysis of Plaintiffs' challenges.

## 1. First Amendment: Freedom of Speech

█ Plaintiffs claim that on its face, the Controlled Access Law violates their First Amendment right to freedom of speech under the First Amendment, positing that the Law constitutes an improper scheme of censorship of religious speech and ideas, creating a restriction on constitutionally protected speech. "The State may ... enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Frisby v. Schultz,* 487 U.S. 474, 481 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), *citing Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S.

37 at 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

The Supreme Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing. *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). "A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what messages residents will hear may serve these important interests without running afoul the First Amendment." *Hynes,* 425 U.S. at 617, 96 S.Ct. at 1759. A regulation may proscribe particular conduct in order to protect a governmental interest unrelated to the suppression of free expression. *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Such a regulation comes under the "relatively lenient" level of judicial scrutiny represented by the *O'Brien* standard. *Young v. New York Transit Auth.,* 903 F.2d 146 (2d Cir.1990) (Altimari, J.) (*citing O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679). "It is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid." *Id.*

Pursuant to *O'Brien,* a government regulation is sufficiently justified when: (1) "it is within the constitutional power of the Government;" (2) "it furthers an important or substantial governmental interest;" (3) "the governmental interest is unrelated to the suppression of free expression;" and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id., quoting O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. *See also City Council of Los Angeles v. Taxpayers For Vincent,* 466 U.S. at 805, 104 S.Ct. at 2128.

As even the Defendants in this case readily admit, streets have traditionally been considered public fora. *Frisby,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). There is no question that streets in Puerto Rico are public property. As the Supreme Court of Puerto Rico has stated, "[ . . . ] streets are things for public use and in the public domain independent of the jurisdiction under which they are found, be it municipal or state." *Maracaibo,* 144 D.P.R. at 29, 1997 WL 870832 (Court translation), *citing* 31 P.R. Laws Ann. §§ 1024–1025. The fact that a street runs through a residential area is of no consequence. *Frisby,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420. These are public fora regardless of where the title to these streets resides. *Id.* However, the fact that streets are public fora for purposes of the exercise of First Amendment-protected conduct does not compel a result that the use of streets may not be legally and lawfully regulated to protect legitimate state interests. *Id.* For the State to implement content-neutral regulation of the time, place, and manner of exercise of First Amendment rights in public fora, the regulation must be narrowly tailored to serve significant government interests and leave open ample alternative channels of communication. *Id., citing Perry Education Assoc. v. Local Educators' Assoc.,* 460 U.S. 37, at 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The *Frisby* test is essentially a streamlining of the earlier *O'Brien* test.

In this case the regulation of access to the streets within the urbanizations is content-neutral precisely because it regulates access to the streets and nothing more; nothing on the face of the law pertains to

visitors' intended conduct once inside. The Court can find no language in the statute that could be interpreted as creating a content-based restriction. Whether or not the letter of the law is followed by the guard at the access point or any other pertinent party is not a facial matter; rather, that type of claim is addressed by Plaintiffs' as-applied Constitutional claims, which are addressed below. Thus, the only remaining issues to resolve are whether the regulation is narrowly tailored to serve significant government interests and whether it leaves open alternative channels of communication. *Frisby,* 487 U.S. at 482, 108 S.Ct. at 2501.

Starting with the second prong of the test, the Court finds that channels of communication are suitably left open by the Controlled Access Law. The Court can find nothing in the Controlled Access Law that prevents any party from communicating with the residents of controlled-access urbanization by means other than walking up to their front door. Aside from being able to have the guard at the entrance to the urbanization call the resident, anybody wishing to communicate with these residents can still do so by any of a myriad of means available in today's society: via mail, via telephone, via e-mail, via advertising in the media, via direct contact in a public forum. The same goal of enhancing security is what the Controlled Access law was created to achieve.

As for whether the regulation is narrowly tailored to serve a significant government interest, the Court finds that Controlled Access law is narrowly tailored to serve the government's significant interest in helping to prevent crime. As the Legislature's Statement of Motives reads,

> The problem of criminality requires short-term as well as long-term planning that will allow us to reach the roots of the problem, as well as concrete and immediate actions that will bring back the peace our people require. We all realize that the participation of the community in this fight against crime is of utmost importance. For that reason, we understand that this measure groups and incorporates certain communities in such function. *Statement of Motives,* Act No. 21, May 20, 1987, 1987 P.R. Laws Ann. § 63.

By restricting all visitors' access to purely residential communities that do not constitute a thoroughfare or route of communication to another destination, the Controlled Access law is intended to help to prevent these communities in preventing crime by keeping track of who enters the community, thereby reducing the risk of crimes like burglaries. Therefore, because the Court finds that the Controlled Access laws are narrowly tailored to serve a significant government interest in crime prevention while leaving open alternative channels of speech, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates their First Amendment right to free speech.

### 2. First Amendment: Freedom of the Press

■ As another iteration of their First Amendment arguments, Plaintiff Watchtower also alleges that the Controlled Access Law violates its First Amendment right to freedom of the press, in that the Law constitutes an improper scheme of censorship of religious publications. The Court quickly disposes of this argument. As the Court found above, the Controlled Access Laws are content-neutral. No reading of the Laws would lead to a finding that they are in any way directed at censoring religious speech.

As Plaintiffs rightly point out, the Supreme Court has repeatedly held that "liberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988), *quoting Ex parte Jackson*, 96 U.S. 727, 733, 6 Otto 727, 24 L.Ed. 877 (1878); *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938), 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938).

 Nothing in the Controlled Access Laws prevents Watchtower or any other organization or group from circulating their published materials. If Plaintiffs or members of their religion fail to gain access to a closed community because the resident called declines to approve their entry, they are still free to mail that person their publications. There is no Constitutional guarantee of the right to go up to someone's door to hand them a publication. Because the Court can see no set of facts wherein the Controlled Access Laws facially constitute an abridgement of Plaintiffs' First Amendment freedom of the press rights, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates Plaintiffs' freedom of the press rights.

### 3. First Amendment: Freedom of Association

 Plaintiffs, covering all their First Amendment bases, also broadly allege that the Controlled Access Law violates their right to free association. In doing so, they point to the Supreme Court's holding in *Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). However, Plaintiffs' reliance on *Bates* is inapposite. The Supreme Court's holdings in *Bates* and its progeny are premised on regulations that compel groups to disclose their membership lists, resulting in situations wherein the members of the group bring a right to free association challenge because the regulations result in their identities being impermissibly revealed to the public. These holdings pertain to situations completely different from that created by the Controlled Access scheme.

As we have discussed above, the guards at these controlled access communities are limited in what they may ask by the *Maracaibo* holding. They may ask only about the visitor's destination or the nature of his or her errand within the urbanization, or, where the resident has authorized it, the visitor's name. *Maracaibo*, 144 D.P.R. at 38. The Puerto Rico Supreme Court, in its inquiry into the constitutionality of the Controlled Access Laws in *Maracaibo*, examined these same issues, and concluded that the destination/nature of errand inquiry was the means of enforcing the law with the least amount of intrusion into citizens' constitutional rights and was therefore permissible. *Id.* In doing so, the Supreme Court of Puerto Rico drew an analogy between the inquiry allowable under the Controlled Access regime and the interventions of a "preventive nature" that take place at the entrances to parks, stadiums, coliseums and other public buildings, certain areas of airports and military bases, among other public installations, pointing out that in upholding such interventions, courts have utilized the "least intrusive means" analysis. *Id.*

When faced with the inquiry dictated by the *Maracaibo* court, the visitor is not forced to reveal his associational ties; he or she may simply say that he or she wants to visit a particular resident, and if asked for what purpose, can reply that he or she wants to speak with the resident

about a private matter. At no point is there a required disclosure of the sort that would impermissibly violate Plaintiffs' or anyone else's freedom of association. Therefore, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates their freedom of association rights.

#### 4. First Amendment: Free Exercise of Religion

■ Plaintiffs also facially challenge the constitutionality of the Controlled Access Law under the First Amendment by arguing that it illegally infringes upon their right to free exercise of religion. Plaintiffs point to a line of Supreme Court opinions dating back to 1943 that look favorably upon Jehovah's Witnesses' rights to distribute their pamphlets door-to-door.

Upon closer examination, however, those cases deal with situations that are not analogous to the issues before the Court in this matter. For example, in *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Court struck down a municipal ordinance that required a license for door-to-door solicitation of orders for merchandise because it levied an impermissible monetary tax on speech of a non-commercial nature. This case line culminates with *Watchtower v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), where the Supreme Court invalidated an ordinance that required individuals to obtain a permit prior to engaging in door-to-door advocacy and to display the permit upon demand on the basis that it violated the First Amendment. As can be plainly seen, these are both very different fact situations, where a tax is levied or a permit requirement is imposed. Neither of the two applies here. As we have stated above, noth-

ing on the face of the Controlled Access Laws prevents anyone's free exercise of religion. No taxes are levied, and no registrations are required. As such, the Court cannot see how the Controlled Access Law on its face infringes upon Plaintiffs' right to free exercise of religion, and, consequently, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates Plaintiffs' free exercise rights.

#### 5. Fourth Amendment: Unreasonable Search and Seizure

Plaintiffs also allege that the Controlled Access Law violates Plaintiffs' Fourth Amendment right to be secure from unreasonable searches and seizures. Plaintiffs claim that their rights under the Fourth Amendment are curtailed in that the Controlled Access Law "constitute[s] an improper regime of suspicionless stops," causing a "chilling effect." Plaintiffs' *Complaint* at 10. Plaintiffs' claim of violation of the Fourth Amendment stems from the fact that upon approaching a checkpoint, the Congregación's members must stop and identify themselves. Plaintiffs claim that said stop violates their rights under the Fourth Amendment to be free from unreasonable searches and seizures and that, as such, the Controlled Access Law also violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution.

■ In confronting this issue, the Court must resolve two questions: whether the checkpoints established by the statute are indeed searches within the meaning of the Fourth Amendment, and if they are, whether these are unreasonable. It is the Court's opinion that the answer to both questions is no.

In delineating what constitutes a seizure, the Supreme Court wrote in *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984),

The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio, supra,* 392 U.S. [1], at 19, n. 16, 88 S.Ct. [1868], at 1879 n. 16[, 20 L.Ed.2d 889 (1968)]. While applying such a test is relatively straightforward in a situation resembling a traditional arrest, *see Dunaway v. New York,* 442 U.S. 200, 212–216, 99 S.Ct. 2248, 2256–2258, 60 L.Ed.2d 824 (1979), the protection against unreasonable seizures also extends to "seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall, supra,* 446 U.S. [544] at 554, 100 S.Ct. [1870], at 1877[, 64 L.Ed.2d 497 (1980)] (footnote omitted); *see Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion). *I.N.S. v. Delgado,* 466 U.S. at 215, 104 S.Ct. 1758.

The Controlled Access Laws do not call for the use of the government's police officers in controlling access to closed communities. This is done by private guards hired by the closed communities. The Controlled Access Law contains no requirement that visitors talk to the security guard for any amount of time longer than they would care to; the guard may employ the *Maracaibo* inquiry, and the visitor may opt to either answer the questions or leave the premises if he or she does not wish to answer them. As the Supreme Court put it in *Delgado,*

What is apparent ... is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 231–234, 93 S.Ct. 2041, 2049–2051, 36 L.Ed.2d 854 (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. *Delgado,* 466 U.S. at 216, 104 S.Ct. 1758.

Applying this standard, it is clear to the Court that the stops at neighborhood access points and the questions asked by private guards there do not constitute a detention under the Fourth Amendment.

Every non-resident is stopped at the gates of these communities, and all are asked the same questions regarding their destination or the nature of their business therein, which questions are not by any reasonable standard so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded. Therefore, the Court concludes that the stops by private security guards at the checkpoints to closed communities do not constitute a detention under the Fourth Amendment, and therefore the Court need not address the issue of reasonableness. This being the case, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates their Fourth Amendment rights.

### 6. Right to Travel/Freedom of Movement

■ The last of Plaintiffs' facial constitutional challenges to the Controlled Access Laws is a perfunctory allegation that the Laws infringe upon their right to travel and to freedom of movement. The Supreme Court, as pointed out by Plaintiffs, has stated that freedom of movement is "basic in our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). However, we dispose of this argument quickly.

The Controlled Access Law abrogates no one's right to travel or freedom of movement. It merely allows property owners regulate to a degree access into their own property. As discussed in greater detail above, the Controlled Access Law contains safeguards for situations where the community to be closed off contains therein public buildings or facilities, or where the community is a thoroughfare or communication point to another destination. 23 P.R. Laws Ann. §§ 64a(a)-(c). As

no relief could be granted under any set of facts that could be proved consistent with the allegations in this case with regards to Plaintiffs' freedom of travel claim, the Court hereby **GRANTS** Defendants' motion on this issue and **DISMISSES WITH PREJUDICE** Plaintiffs' claims that the Controlled Access Law on its face violates their right to travel and to freedom of movement.

### C. Constitutionality of the Controlled Access Law as Applied to Plaintiffs; § 1983

The Court is also faced with making a determination as to whether the Controlled Access Law is unconstitutional as applied to Plaintiffs. However, at this point in these proceedings, to make such a determination would be premature given the underdeveloped nature of the factual record in this case. *See Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41 (1st Cir.2005) (Selya, J.). Therefore, the Court hereby **DENIES WITHOUT PREJUDICE** Defendants' Motion to Dismiss as to Plaintiffs' "as applied" and § 1983 claims. Such claims, which shall remain active before this Court, will be addressed at a more opportune time, after the parties have been afforded the opportunity to conduct discovery in this matter in order to provide the Court with an adequate factual background under which to make its determinations in this matter.

## VI. CONCLUSION

For the aforementioned reasons, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' "Motion to Dismiss Under Rule 12(b)(6) and Opposition to Plaintiffs' Request for a Temporary Restraining Order and Preliminary Injunction" (**docket No. 13**). Plaintiffs' facial Constitutional challenges are hereby **DISMISSED WITH PREJUDICE.**

Plaintiffs' "as applied" Constitutional claims and § 1983 claims remain before the Court. **On or before August 29, 2005,** Defendants **SHALL** answer the parts of the complaint that have not been dismissed.

**IT IS SO ORDERED.**